No. 22-414C
(Judge David A. Tapp)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

COTTER CORPORATION (N.S.L.),

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# DEFENDANT'S MOTION TO DISMISS

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

JOHN H. ROBERSON
Senior Trial Attorney
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-7972
Facsimile: (202) 514-8640
john.roberson@usdoj.gov

Dated: August 25, 2022

Attorneys for Defendant

TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iv

INTRODUCTION ..... 1

QUESTIONS PRESENTED ..... 4

STATEMENT OF FACTS ..... 5

I. The Regulatory Framework ..... 5

A. The Atomic Energy Act; The Atomic Energy Commission; And Establishment Of The Department Of Energy And The Nuclear Regulatory Commission ..... 5

B. The Price-Anderson Act ..... 5

II. Mallinckrodt Entered Into A Contract With The United States To Process Uranium In The St. Louis Area ..... 8

A. The Initial Agreements ..... 8

B. SA No. 45 ..... 9

C. SA No. 81 ..... 10

D. SA No. 115 ..... 10

E. SA No. 122 ..... 10

F. SA No. 124 ..... 11

III. The United States Sold The Radioactive Material Located At The SLAPS To Continental Mining ..... 11

IV. Commercial Discount Took Ownership And Possession Of The Material ..... 12

V. Cotter Purchased The Radioactive Material From Commercial Discount, Maintained The Latty Avenue Site, Transported Most Of The Material To Colorado, And Dumped Some Of The Material In A St. Louis Landfill ....... 12

VI. Cotter Was Acquired By Commonwealth Edison, Which Sold Cotter To General Atomics, With Commonwealth Edison Agreeing To Indemnify Cotter For Any Liability Related To The West Lake Landfill And Latty Avenue Sites ........ 13

VII. The *McClurg* Litigation ........ 14

ARGUMENT ........ 16

I. Standard Of Review ........ 16

A. Motion To Dismiss Pursuant To Rule 12(b)(1) ........ 16

B. Motion To Dismiss Pursuant To Rule 12(b)(6) ........ 16

II. Count I Fails To State A Claim For Statutory Indemnification Because It Fails To Plead The Basis Of Either Of The Two Avenues For Statutory Indemnification ........ 17

A. Count 1 Fails To Plead Cotter Is Eligible For Contractual Indemnification ........ 20

1. The PAA's Contractual Indemnification Provisions ........ 20

2. Mallinckrodt's Contract Incorporated The PAA Indemnification Provisions, Which Require A Nexus Between Contract Activity For The Benefit Of The United States And A Government Indemnification Obligation ........ 21

3. The PAA's Provisions Reflect The Legislative Intent Concerning The Scope Of The Government's Indemnification Responsibilities ........ 23

4. Because Cotter Was Not A Government Contractor With Respect To The Radioactive Material, And Its Activities Were Not For The Government's Benefit, Cotter Is Not Entitled To Government Indemnification ........ 25

C. Cotter Also Fails To Plausibly Plead Indemnification Under The PAA's Licensee Indemnification Provision ........ 28

1. The PAA Required Privately Provided Indemnification As A Prerequisite For Government Indemnification Of Licensees ....................28

2. Cotter Did Not Obtain Privately Provided Indemnification And Was Not Ordered To Do So In Connection With Its Possession Of The Radioactive Material And Thus It Was Not Entitled To Government Indemnification ....................29

D. Cotter's Theories Of Indemnification Liability Ignore That Continental Purchased The Radioactive Material Through A Bill Of Sale That Expressly Disavowed Government Responsibility For The Material ....................30

1. The AEC Sold The Radioactive Material To Continental Disavowing Any Responsibility For Harm Resulting From The Material ....................31

2. Cotter, As A Later Downstream Purchaser Of The Material Did Not Obtain Rights To Government Indemnification Along With Its Purchase – Or With Its Receipt Of A License ....................32

III. Cotter Fails To Plausibly Allege It Was An Intended Beneficiary Of Mallinckrodt's Contract With The United States ....................33

A. The Standards Concerning Third-Party Beneficiary Claims ....................34

B. Cotter Has Not Sufficiently Alleged, Nor Can It Show, That It Was An Intended Beneficiary Of The Government's Contract With Mallinckrodt ....................35

C. Cotter Has Not Alleged That The Government Breached The Contract ....................36

D. This Court Should Dismiss Count II For Lack Of Standing ....................37

CONCLUSION ....................37

# TABLE OF AUTHORITIES


CASES PAGE(S)

*Am. Contractors Indem. Co. v. United States*,
81 Fed. Cl. 682 (2008)....................1

*Am. Online Latino v. Am. Online, Inc.*,
250 F.Supp.2d 351 (S.D.N.Y. 2003)....................37

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................17

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011)....................34

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................16

*Braun v. Dep't of Health & Hum. Servs.*,
998 F.3d 1312 (Fed. Cir. 2021)....................27

*City of Fresno v. United States*,
148 Fed. Cl. 19 (2020)....................37

*Crow Creek Sioux Tribe v. United States*,
900 F.3d 1350 (Fed. Cir. 2018)....................16

*Davis v. Michigan Dept. of Treasury*,
489 U. S. 803 (1989)....................28

*Diaz v. United States*,
156 Fed. Cl. 270 (2021)....................16, 17

*Doyle v. United States*,
129 Fed. Cl. 147 (2016)....................36

*Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*,
438 U.S. 59 (1978)....................5

*Dyck v. Albertelli Law*,
98 Fed. Cl. 624 (2011)....................16

*Erickson Air Crane Co. of Washington, Inc. v. United States*,
731 F.2d 810 (Fed. Cir. 1984)....................34, 37

*Fairholme Funds, Inc. v. United States*,
26 F.4th 1274 (Fed. Cir. 2022)....................37

*Flexfab, L.L.C. v. United States*,
424 F.3d 1254 (Fed. Cir. 2005)....................34, 35

*G4S Technology LLC v. United States*,
779 F.3d 1337 (Fed. Cir. 2015)....................35

*German Alliance Ins. Co. v. Home Water Supply Co.*,
226 U.S. 220 (1912)....................34

*HCSC-Laundry v. United States*,
450 U.S. 1 (1981)....................27

*Home Depot U. S. A., Inc. v. Jackson*,
139 S. Ct. 1743 (2019)....................28

*Ingham Reg'l Med. Ctr. v. United States*,
126 Fed. Cl. 1 (2016)....................1

*Ingham Reg'l Med. Ctr. v. United States*,
874 F.3d 1341 (Fed. Cir. 2017)....................1

*Kiick v. Metro. Edison Co.*,
784 F.2d 490 (3d Cir. 1986)....................22

*Legal Aid Soc. Of New York v. United States*,
92 Fed. Cl. 285 (2010)....................1

*Lindsay v. United States*,
295 F.3d 1252 (Fed. Cir. 2002)....................16

*Loc. 1303-362 of Council 4 v. KGI Bridgeport Co.*,
No. 3:12CV1785 AWT, 2013 WL 4735584 at * 7
(D. Conn. Sept. 3, 2013)....................36

*Love Terminal Partners v. United States*,
97 Fed. Cl. 355, 385-86 (2011)....................1

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)....................16

*McClurg et al. v. Mallinckrodt, Inc. et al.*,
No. 4:12-cv-00361-AGF (E.D. Mo.)....................1, 3, 11, 15

*P. Gas and Electric Co. v. United States*,
838 F.3d 1341 (Fed. Cir. 2016) ............................................................34

*Parkinson v. Dep't of Justice*,
874 F.3d 710 (Fed. Cir. 2017) ............................................................27

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ............................................................27

*Reynolds v. Army & Air Force Exch. Serv.*,
846 F.2d 746 (Fed. Cir. 1988) ............................................................16

*Rocovich v. United States*,
933 F.2d 991 (Fed. Cir. 1991) ............................................................1

*San Carlos Irrigation & Drainage Dist. v. United States*,
877 F.2d 957 (Fed. Cir. 1989) ............................................................36

*Silkwood v. Kerr–McGee Corp*.,
464 U.S. 238 (1984) ............................................................30

*Smith v. Gen. Elec. Co.*,
938 F. Supp. 70 (D. Mass. 1996) ............................................................22

*Sommers Oil Co. v. United States*,
241 F.3d 1375 (Fed. Cir. 2001) ............................................................17

*Stuler v. United States*,
No. 07-642, 2008 WL 957009 *2 (W.D. Pa. Apr. 8, 2008) ............................................................1

*Stuler v. United States*,
570 F.3d 1373 (Fed. Cir. 2009) ............................................................1

*TMI Litig. Cases Consol. II*,
940 F.2d 832 (3d Cir. 1991) ............................................................30

*Toon v. United States*,
96 Fed. Cl. 288 (2010) ............................................................1

*Wash. Mkt. Co. v. Hoffman*,
101 U.S. 112 (1879) ............................................................27

*Warth v. Seldin*,
422 U.S. 490 (1975) ............................................................16

## FEDERAL STATUTES

42 U.S.C. § 2010(d)....................20, 27

42 U.S.C. § 2012(i)....................5

42 U.S.C. § 2014(t)....................8, 27

42 U.S.C. § 2014(w)....................6

42 U.S.C. § 2014(hh)....................7

42 U.S.C. § 2210(a)....................7, 28

42 U.S.C. § 2210(c)....................6, 8

42 U.S.C. § 2210(d)....................7, 8

Pub. L. 79-585, § 2, 60 Stat. 755, 756 (1946)....................5

Pub. L. 83-703, 68 Stat. 919 (1954)....................5

Pub. L. No. 85-256, 71 Stat. 576 (1957)....................*en passim*

Pub. L. 93-438, § 104(a), 88 Stat. 1233, 1237 (1974)....................5

Pub. L. 95-91, §§ 201, 301, 703, 91 Stat. 565, 569, 577–78, 606 (1977)....................5

Pub. L. 100-408, § 4(a), 102 Stat. 1066, 1068 (1988)....................7

## FEDERAL REGULATIONS

48 C.F.R. § 952.250-70 (2016)....................8, 21

## FEDERAL RULES

Rule 12(b)(1) of the United States Court of Federal Claims....................1, 16

Rule 12(b)(6) of the United States Court of Federal Claims....................1, 16, 33

## MISCELLANEOUS AUTHORITIES

5B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357....................1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| COTTER CORPORATION (N.S.L.), | ) | |
| | ) | |
| Plaintiff, | ) | No. 22-414C |
| | ) | |
| v. | ) | Judge David A. Tapp |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS**

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that this Court dismiss the complaint filed by Cotter Corporation (N.S.L.) (Cotter) for failure to state a claim upon which relief may be granted and for lack of standing. In support of this motion, we rely upon the complaint, documents cited by Cotter in its complaint, and matters of public record.[1]

**INTRODUCTION**

Cotter brings this suit "to recover $14,961,418.74 for the costs of settling and defending the public liability action in *McClurg et al. v. Mallinckrodt, Inc. et al.*, No. 4:12-cv-00361-AGF

---

[1] Although we rely upon a number of documents not attached to Cotter's complaint, our motion remains a motion to dismiss. "[On] an RCFC 12(b)(1) motion, the court is permitted to 'inquire into jurisdictional facts that are disputed.'" *Legal Aid Soc. Of New York v. United States*, 92 Fed. Cl. 285, 287 n.1 (2010) (citing *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)). Moreover, a motion to dismiss is not converted into a summary judgment motion when the motion attaches exhibits that concern "matters incorporated by reference or integral to the claim," or "undisputed documents relied upon by the plaintiff, other items appearing in the record of the case, and matters of public record." *Am. Contractors Indem. Co. v. United States*, 81 Fed. Cl. 682, 687-88 (2008) (quoting 5B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 and *Stuler v. United States*, No. 07-642, 2008 WL 957009) at *2 (W.D. Pa. Apr. 8, 2008) *rev'd on other grounds* 570 F.3d 1373 (Fed. Cir. 2009)). *See also Ingham Reg'l Med. Ctr. v. United States*, 126 Fed. Cl. 1, 20 (2016) *aff'd in part and rev'd in part on other grounds*, 874 F.3d 1341 (Fed. Cir. 2017); *Love Terminal Partners v. United States*, 97 Fed. Cl. 355, 385-86 (2011); *Toon v. United States*, 96 Fed. Cl. 288, 299 (2010).

(E.D. Mo.) ("*McClurg*")." Compl. p. 1. The suits, alleging personal injury and wrongful death, were brought by "more than 500 individual plaintiffs," against Cotter and other defendants, claiming that "their injuries were caused by exposure to the radioactive residue material allegedly produced, handled, stored, or disposed of by the defendants" at various sites. Compl. ¶ 36. Cotter, the complaint explains, came into the possession of the material from a downstream purchaser of Government-sold material. Compl. ¶¶ 21-22.

On that ownership basis, in Count I, Cotter broadly asserts, that it is entitled to "Statutory Indemnity" under the Price-Anderson Act, Pub. L. No. 85-256, 71 Stat. 576 (1957) (42 U.S.C. 2011 *et. seq*.), observing that the Act "mandates that the United States indemnify and compensate any "person indemnified" for "public liability" arising from a "nuclear incident," as defined in the Act." Compl. ¶ 54. In Court II, Cotter asserts it is entitled to "Contractual Indemnity," asserting that it is a third-party beneficiary of a contract between the AEC and its contractor, Mallinckrodt Chemical Works (Mallinckrodt), in which those contracting parties agreed that "the United States would indemnify Mallinckrodt and 'other persons indemnified' for public liability resulting from certain nuclear incidents." Compl. ¶ 63.

Both counts should be dismissed as neither plausibly alleges the predicate for either a statutory or contractual cause of action, and because Cotter's mere possession of nuclear material that was once owned by the Government falls well outside the scope of either indemnification. As for Count I, statutory indemnification is available only in two circumstances, pursuant to activity relating to a contract for the benefit of the United States, and pursuant to licensees required to obtain private financial protection. *See* Pub. L. No. 85-256 §§ 170(a), 170d). Here, Cotter's private, commercial use of the radioactive material was *not* undertaken in furtherance of the Government's contract with Mallinckrodt. Thus, Cotter's PAA claim fails to meet a

prerequisite for Government indemnification in a contractual context. And although Cotter obtained a license from the Atomic Energy Commission (AEC) to possess and process the radioactive material, that license, consistent with terms set forth in the PAA, did not provide Cotter with Government indemnification with respect to the material.

As for Count II, Cotter's claim for indemnification as a third-party beneficiary, Cotter's claim fails because it provides no showing that the Government and Mallinckrodt intended to provide Cotter what the PAA itself does not. Whether viewed under the PAA's contractual or licensing provisions, Cotter cannot show that the Government and Mallinckrodt intended to provide indemnification to third-party beneficiaries in disregard of the conditions and prerequisites for PAA indemnification in those contexts. Certainly, Cotter had no contract with the United States or Mallinckrodt. Moreover, it did not purchase the radioactive material at issue in the *McClurg* litigation from the United States, nor did it purchase it from Mallinckrodt. Instead, Cotter was a downstream purchaser of the material from a third party, which itself did not purchase the material from the United States. Apparently to avoid this failure, Cotter implausibly asserts it was an intended beneficiary of an upstream contract between the AEC and its contractor, Mallinckrodt.

Furthermore, Cotter's claim in Count II ignores the fact that the Government sold the material to a different, third-party purchaser, with the bill of sale stating that the Government sold the material "as is," without future responsibility for the material, and with a recognition that there were no other agreements concerning the material. The United States' disavowal of future liability for the radioactive material that it sold is entirely consistent with the fact that, with respect to Cotter's later possession of that material, Cotter was not an intended beneficiary of an indemnification promise by the AEC. And the United States' disavowal in its bill of sale is

consistent with the contractual and licensing provisions of the PAA, which, in this instance (as we discuss with respect to Count I) do not provide indemnification for a mere licensee in Cotter's position. Certainly, the PAA makes no mention of any such downstream protection.

Moreover, even if Congress intended such attenuated protection without saying so, Count II still fails to state a claim. First, Cotter's third-party beneficiary does not allege that it presented its claim for *McClurg* expense indemnification to the Government or that the Government refused that claim. Therefore, Cotter has not alleged that the Government breached the Mallinckrodt Contract (as Cotter interprets that contract). Nor could it. But without a breach of the Mallinckrodt Contract, there can be no third-party beneficiary claim against the Government.

Finally, given that Cotter fails to plausibly allege a third-party beneficiary claim, and given that Cotter had no contract with the Government, its third-party beneficiary claim must also be dismissed for lack of standing.

## QUESTIONS PRESENTED

1. Does Cotter state an indemnification claim for its litigation expenses in *McClurg* under the PAA when Cotter purchased and used the radioactive material solely for its own commercial interests and not in connection with a contract with the United States?

2. Can Cotter state an indemnification claim for its litigation expenses in *McClurg* as an alleged third-party beneficiary when it has not shown that the Government and Mallinckrodt intended to provide Cotter with indemnification rights that extend beyond the PAA's indemnification provisions?

3. Can Cotter state a claim as an alleged third-party beneficiary when it has not alleged that the Government breached the Mallinckrodt Contract?

4. Does Cotter have standing to present its third-party beneficiary claim when it does not fall within the class of potential third-party beneficiaries of the Mallinckrodt Contract because Cotter did not undertake its activities involving the source material in connection with the United States' contract with Mallinckrodt and its license did not provide for Government indemnification?

## STATEMENT OF FACTS

### I. The Regulatory Framework

#### A. The Atomic Energy Act; The Atomic Energy Commission; And Establishment Of The Department Of Energy And The Nuclear Regulatory Commission

The Atomic Energy Act of 1946, Pub. L. 79-585, § 2, 60 Stat. 755, 756, established the AEC. Eight years later, the Atomic Energy Act (AEA) of 1954, Pub. L. 83-703, 68 Stat. 919, substantially revised the Atomic Energy Act of 1946. Although the AEA has been amended repeatedly over time, the overall structure of the 1954 Act remains the central statutory framework in the field.

The AEC was abolished with the enactment of the Energy Reorganization Act of 1974. Pub. L. 93-438, § 104(a), 88 Stat. 1233, 1237. Congress provided for this change, in part, because "it is in the public interest that the licensing and related regulatory functions of the [AEC] be separated from the performance of the other functions of the [AEC][.]" Pub. L. 93-438, § 2(c). The Energy Reorganization Act established in the AEC's place the Energy Research and Development Administration (ERDA) and the Nuclear Regulatory Commission (NRC). Pub. L. 93-438, §§ 101, 201. Congress "transferred to the [NRC] all the licensing and related regulatory functions of the [AEC]." Pub. L. 93-438, § 201(f). In 1977, Congress established the Department of Energy (DOE), to which were transferred, among other things, the ERDA's functions. Pub. L. 95-91, §§ 201, 301, 703, 91 Stat. 565, 569, 577–78, 606; Compl. ¶ 35.

#### B. The Price-Anderson Act

The PAA was a 1957 amendment to the AEA. It was enacted for the dual purpose of "protect[ing] the public and . . . . encourag[ing] the development of the atomic energy industry." § 1, 71 Stat. 576 (42 U.S. C. 2012(i)); *see also* Compl. ¶ 1. Congress added the indemnification provisions to incentivize private industry's participation in the nuclear field. *See, e.g., Duke*

*Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 63–64 (1978). The indemnification provisions added by the PAA distinguished between two groups: licensees and contractors. *See* Pub. L. No. 85-256 § 170(a)-(d). And this distinction remains today.

With respect to licensees, the PAA provided that:

> Each license issued under [specified sections], and each construction permit issued under [a specified section] shall, and each license issued under [specified sections] may, have as a condition of the license a requirement that the licensee have and maintain financial protection of such type and in such amounts as the Commission shall require … to cover public liability claims. Whenever such financial protection is required, it shall be a further condition of the license that the licensee execute and maintain an indemnification agreement in accordance with subsection 170c.

*Id.* at 170(a). Accordingly, the PAA provided that certain licensees of the AEC were required to obtain financial protection, and other licensees could be required to obtain financial protection. And if financial protection was required (either statutorily or in the AEC's discretion), then an indemnification agreement would also be required. In these cases, the PAA provided for the Government to indemnify its licensees from "public liability" for a "nuclear incident" above the amount of required financial protection. *See* 42 U.S.C. § 2210(c) (1958).[2]

For AEC contractors, however, indemnification was authorized but not required, and requiring a contractor to obtain private financial protection was in the discretion of the AEC even if indemnification was provided. In its original iteration, the PAA stated that:

> the Commission is authorized … to enter into agreements of indemnification with its contractors for the construction or

[2] A "nuclear incident" is "any occurrence, including an extraordinary nuclear occurrence, within the United States causing . . . bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. 2014(q). "Public liability" is defined (with exceptions not relevant here) as any legal liability arising out of or resulting from a "nuclear incident." 42 U.S.C. 2014(w).

> operation of production or utilization facilities or other activities ***under contracts for the benefit of the United States*** involving activities under the risk of public liability for a substantial nuclear incident. In such agreements of indemnification, the Commission may require its contractor to provide and maintain financial protection of such a type and in such amounts as the Commission shall determine to be appropriate to cover public liability arising out of or in connection with the contractual activity and shall indemnify the person indemnified against such claims above the amount of financial protection required.

Pub. L. No. 85-256 at 170(d) (emphasis added).[3]

The PAA's indemnification provisions have been revised over time, but this general distinction between indemnification for licensees and contractors remains in the statute's current version. *Compare* 42 U.S.C. § 2210(a), (c) *with* 42 U.S.C. § 2210(d). The one major difference now is that indemnification for contractors was made mandatory with the 1988 amendments. Pub. L. 100-408, § 4(a), 102 Stat. 1066, 1068 (1988). Also in 1988, Congress created a Federal cause of action for claims of "public liability" and provided that the substantive rules for decision in a public liability action would be derived from the law of the State in which the nuclear incident occurs, unless such law is inconsistent with Section 2210. 42 U.S.C. § 2014(hh).

An indemnification agreement (as it pertains to licensees) means that the Commission has

> Agree[d] to indemnify and hold harmless the licensee and other person indemnified, as their interest may appear, from public liability arising from nuclear incidents which is in excess of the

[3] The quoted text sets forth the PAA at the time that the indemnification provisions were adopted as part of the Mallinckrodt contract in 1962. Years after the contract with Mallinckrodt was closed, Congress amended the PAA to make contractor indemnification mandatory instead of discretionary. Thus, the current codified version requires that the Secretary enter into indemnification agreements with those who "conduct activities under a contract" with DOE that involve the risk of public liability. *See* 42 U.S.C. § 2210(d)(1)(A) (2006). Thus, although the phrase "for the benefit of" was discontinued, the statute still links DOE's authority to enter into agreements of indemnification with a requirement that the entities indemnified be conducting activities under a contract with the DOE (which impliedly is for the benefit of the United States).

> level of financial protection required of the licensee . . . . Such a contract of indemnification shall cover public liability arising out of or in connection with the licensed activity.

Pub. L. 85-256 at § 170(c). *See also* 42 U.S.C. § 2210(c).

"The term 'person indemnified' means (1) with respect to a nuclear incident occurring within the United States . . . the person with whom an indemnity agreement is executed or who is required to maintain financial protection, and any other person who may be liable for public liability[.]" 42 U.S.C. § 2014(t).

With the separation of the former AEC's functions into the NRC and DOE, NRC is responsible for the indemnification of licensees (those that are granted indemnification), and DOE is responsible for indemnification of its contractors. DOE provides its indemnification through "agreements of indemnification," 42 U.S.C. § 2210(d), which is accomplished through standardized language in its contracts. *See* 48 C.F.R. § 952.250-70 (2016).

## II. Mallinckrodt Entered Into A Contract With The United States To Process Uranium In The St. Louis Area

### A. The Initial Agreements

In April 1942, Mallinckrodt entered into an agreement with the University of Chicago to produce "a special oxide." *See* Ex. A, Mallinckrodt Contract, at DOE1; Compl. ¶ 12. Several months later, this contract was merged with a contract between Mallinckrodt and the United States War Department (contract no. W-7405 eng-29), dated November 23, 1942. *See* Ex. A at DOE3-26. This contract called for Mallinckrodt to operate two Government-owned plants and to produce specific quantities of secret products (refined uranium) to be derived from a product provided by the Government. *See id.* at Art. 1; Compl. ¶ 13.

Mallinckrodt processed uranium under the contract in a facility in downtown St. Louis, Missouri (the St. Louis Downtown Site or SLDS). *Id.* ¶ 14. The material provided to

Mallinckrodt for processing, the processed uranium, and the by-product material from the processing were all, while in Mallinckrodt's possession, owned by the United States. *See id.*; Ex. A at Supplemental Agreement (SA) 21 at DOE118-19, ¶ 2(a); *Id.* at SA 45 at DOE254-55 at Art. III(G)(1); *Id.* at SA 81 at DOE503 at Art. III(G)(1).

On January 1, 1946, Mallinckrodt and the United States entered into SA No. 1, (contract no. W-14-108-Eng-8) (the Contract). *See id.* at DOE27-28; Compl. ¶ 5. Thereafter, the parties entered into a long series of supplemental agreements, with the last supplemental agreement executed in August 1966. *See* Ex. A at DOE776-77. While most of the supplemental agreements addressed the production of increased quantities of material or changes in pricing, certain agreements presented substantive changes to the Mallinckrodt Contract.

First, as acknowledged by SA 10, the contract with the War Department was transferred to the AEC by executive order in December 1946. *See* Ex. A at SA No. 10 at DOE58.

With the continued production of processing of uranium material in the post-war, cold-war period, Mallinckrodt began transporting radioactive residue material from the SLDS to a site near the St. Louis Airport (the St. Louis Airport Site or SLAPS). Compl. ¶ 15. By the late 1950s, several thousand tons of radioactive material had been accumulated at SLAPS. *Id.*

**B. <u>SA No. 45</u>**

In September 1950, the parties agreed to SA 45. Among other things, SA 45 required that, with respect to a claim for indemnification involving personal injury caused by radioactivity, Mallinckrodt must "promptly" give the AEC "written notice" of any claim and "any proceeding or lawsuit in connection with such claim." Ex. A at SA 45 (Sept. 27, 1950) at DOE249-50 at Art. III-E(3). Mallinckrodt was also required to "furnish promptly to the Commission copies of all pertinent papers received by [Mallinckrodt] with respect to any such

claim[.]" *Id.* Upon the AEC's request, Mallinckrodt was required to "authorize representatives of the Government to settle or defend any such claim, proceeding or lawsuit and to represent the Contractor in, or take charge of, any such proceeding or lawsuit[.]" *Id.*

**C. SA No. 81**

In January 1953, SA 81 was put into effect. SA 81 required that Mallinckrodt transport "all residues which are or may be by-products of the operations under this contract," to facilities at the St. Louis Airport Site. Ex. A at SA No. 81 at DOE 469 at Art. I-A (7)(b). And SA 81 stated that indemnification was available "only to the extent that the Contractor is not protected and made whole by insurance." *See id.* at DOE494 at Art. III-E(1). It repeated Mallinckrodt's obligation to promptly notify the Government if it faced any proceeding or lawsuit involving harm from radioactive material. *See id.* at DOE495-96 at Art. III-E(3).

**D. SA No. 115**

SA 115 was put into effect on January 1, 1956. Ex. A at SA 115 at DOE641. This SA recognized an expansion of the AEC's feed materials production facilities in the St. Louis area. *Id.* at DOE644-45 at 4. In addition, it precluded the assignment of the contract, any interest in the Contract, or claim by Mallinckrodt, without AEC's authorization. *Id.* at DOE667 at Art. VII. The SA reiterated Mallinckrodt's obligation to provide the contracting officer with "immediate notice" of any actions filed against Mallinckrodt and to provide "all pertinent papers received . . . with respect to such action or claim." And Mallinckrodt was permitted to settle any such action or claim only "with the Contracting Officer's approval." *Id.* at DOE673-74.

**E. SA No. 122**

In November 1960, Mallinckrodt and the United States entered into SA 122, which replaced the Contract's Disputes clause. *See* Ex. A at SA 122 at DOE725-26 at 1-2. But like the

earlier versions of that clause, it provides that disputes were to be decided by the contracting officer, whose decision would be final and conclusive unless appealed. *Id.* at DOE726 at 2.

**F. SA No. 124**

In August 1962, Mallinckrodt and the United States entered into SA 124. Ex. A at SA No. 124 (DOE742-47). The purpose of the supplement was to add, pursuant to the authority of AEA Section 170, "certain provisions relative to the indemnification of the Contractor and others with respect to public liability resulting from certain nuclear incidents." *Id.* at DOE 742. SA 124 further provided that the definitions set forth in the PAA applied to the new indemnification provision and set forth the newly incorporated indemnification provisions, including, most importantly here, the provisions in paragraphs 3 and 4. *See* Ex. A at DOE743-44 at ¶¶ 3-4.[4]

**III. The United States Sold The Radioactive Material Located At The SLAPS To Continental Mining**

In February 1966, the AEC sold the radioactive source material located at the SLAPS to Continental Mining & Milling Company (Continental). Compl. ¶ 21; Ex. B, *McClurg v. M1 Holdings, et al.*, No. 4:12-cv-361 (E.D. Mo. Feb. 28, 2012) Compl. ¶ 42; Ex. C, Bill of Sale between the United States and Continental (Feb. 25, 1966). The AEC's bill of sale stated that (1) the United States was *not* warranting that the materials sold would not result in injury or damage; (2) title to the material would pass to Continental; (3) Continental would assume full responsibility for the material's care and custody; and (4) there were no other agreements or understandings between the parties of *any kind*. *See* Ex. C at ¶¶ 3, 8, 10, 11. Soon thereafter,

[4] SA 124 also stated that it was not affected by any failure on the part of the Contractor to fulfill any of its obligations under the contract and was not limited in any way by, and was to be interpreted without reference to, any other articles of the contract. *Id.* at ¶ 6, 8.

Continental began transporting the material at SLAPS to 9200 Latty Avenue, Hazelwood, Missouri (the Latty Avenue Site). Compl. ¶ 21.

### IV. Commercial Discount Took Ownership And Possession Of The Material

In early 1967, Commercial Discount Corporation (Commercial Discount), as creditor to Continental, foreclosed on the assets of Continental, including the materials located at Latty Avenue. Ex. B at ¶ 43.

### V. Cotter Purchased The Radioactive Material From Commercial Discount, Maintained The Latty Avenue Site, Transported Most Of The Material To Colorado, And Dumped Some Of The Material In A St. Louis Landfill

Between 1967 and 1969, pursuant to an initial sales agreement between Commercial Discount and Cotter, some of the radioactive material was transported to a Cotter facility in Colorado. Compl. ¶ 22. In 1969, Commercial Discount sold the remaining radioactive materials at Latty Avenue to Cotter. Ex. B at ¶ 44; Compl. ¶ 22; Ex. D, Sale Agreement by Commercial Discount and Cotter (Aug. 7, 1969). In connection with the sale of the radioactive materials and Cotter's possession of that material, Cotter applied to AEC for a Source Material License, so that Cotter could continue the operation at the Latty Avenue location. *See* Ex. E, Letter from Cotter to AEC (Dec. 16, 1969).

On December 30, 1969, pursuant to Section 63 of the AEA, the AEC issued Cotter a Source Material License, AEC license no. SUB-1022. *See* Ex. F, Source Material License for Cotter (December 30, 1969); AEA § 63.[5] AEC's license only authorized use of the source material by Cotter at Latty Avenue. *See* Ex. F at 2. Between July and October 1973, Cotter

---

[5] Section 63 states, in relevant parts, that "[t]he Commission is authorized to issue licenses for and to distribute source material within the United States to qualified applicants requesting such material . . . (3) for use under a license issued pursuant to section 103." AEA § 63(a)(3). Section 103, in turn provides the Commission with authority to issue licenses to applicants seeking to use source material for industrial or commercial purposes. AEA § 103(a).

arranged for the transportation of some of the radioactive source material owned by Cotter at Latty Avenue to the West Lake Landfill in Bridgeton, Missouri. Compl. ¶¶ 23, 41; Ex. B ¶ 45.

By the end of 1973, Cotter had stopped its operations at Latty Avenue. Compl. ¶ 24. In November 1974, at Cotter's request, the AEC terminated Cotter's source material license. *Id.*

## VI. Cotter Was Acquired By Commonwealth Edison, Which Sold Cotter To General Atomics, With Commonwealth Edison Agreeing To Indemnify Cotter For Any Liability Related To The West Lake Landfill And Latty Avenue Sites

Cotter has existed as a uranium production company since its incorporation in 1956. Compl. ¶ 10. Its ownership, however, has changed over time. Cotter was purchased by and became a wholly owned subsidiary of Commonwealth Edison (ComEd) in 1975. *See* https://www.ga.com/affiliated-companies. ComEd, in turn, became a subsidiary of Exelon Corporation (Exelon). *See, e.g.,* https://www.exeloncorp.com/companies. ComEd sold Cotter to General Atomics in early 2000. *See* https://www.ga.com/affiliated-companies. As part of that sale, ComEd agreed to indemnify Cotter for any liability costs arising from Cotter's activities at the West Lake Landfill and Latty Avenue sites.[6] Cotter's current parent company is General

---

[6] ComEd's indemnification obligations with respect to Cotter are noted in Exelon's 10K filings:

> In 2000, ComEd sold Cotter to an unaffiliated third-party. As part of the sale, ComEd agreed to indemnify Cotter for any liability arising in connection with the West Lake Landfill. In connection with Exelon's 2001 corporate restructuring, this responsibility to indemnify Cotter was transferred to Generation. . . .
>
> In August 2011, Cotter was notified by the DOJ that Cotter is considered a PRP with respect to the government's clean-up costs for contamination attributable to low level radioactive residues at a former storage and reprocessing facility named Latty Avenue near St. Louis, Missouri. The Latty Avenue site is included in ComEd's (now Generation's) indemnification responsibilities discussed above as part of the sale of Cotter. The radioactive residues had been generated initially in connection with the processing of uranium ores as part of the U.S. Government's Manhattan Project.

Atomics Uranium Resources, LLC. *See Cotter Corp. (NSL) v. United States*, No. 22-414C, (Fed. Cl.) Corporate Disclosure Statement (ECF No. 5).[7]

## VII. The *McClurg* Litigation

On February 28, 2012, in *McClurg,* plaintiffs claiming personal injury and emotional distress sued Cotter and others due to an alleged release of radioactive source material at various sites in St. Louis County. Compl. ¶ 4; *see also* Ex. B. The *McClurg* plaintiffs claimed that their radiation exposure came from the Latty Avenue and West Lake Landfill sites. Compl. ¶ 36. In March 2013, the *McClurg* court summarized the plaintiffs' radiation-related counts:

> Plaintiffs in each complaint allege that, as a direct result of Defendants' reckless, negligent, and/or grossly negligent conduct, Plaintiffs were exposed to radioactive substances that were released by Defendants into the environment, including the air, water, and soil, in and around his/her residence in north St. Louis County, Missouri, and that this exposure caused various forms of cancer, with some Plaintiffs having died as a result.

---

> Cotter purchased the residues in 1969 for initial processing at the Latty Avenue facility for the subsequent extraction of uranium and metals. In 1976, the NRC found that the Latty Avenue site had radiation levels exceeding NRC criteria for decontamination of land areas.

Ex. G, Exelon 10-K (Feb. 25, 2022) at 310.

[7] Cotter's complaint does not acknowledge the indemnification that it or its owners appear to have received from ComEd (or Generation) or the effect of that indemnification given the provisions of SA 124 at ¶ 3(a); and it does not address whether its complaint is on behalf of ComEd (or Generation). The information concerning this indemnification is relevant to whether Cotter is seeking a double recovery from the United States with respect to Cotter's costs in *McClurg*. It is also potentially relevant to whether Cotter has assigned its claims against the United States, in potential violation of the Anti-Assignment Act and SA 115, Art. VII, or is seeking a recovery from the United States on behalf of ComEd as indemnitors (potentially setting forth a claim that this Court does not have jurisdiction to entertain). The United States reserves its right to pursue and potentially present these issues should this case continue beyond this motion.

Ex. H, *McClurg v. MI Holdings*, No. 4:12CV00641, Mem. and Order (March 27, 2013) (ECF No. 141) at 6. *See also* Compl. ¶ 39.

In January 2014, the *McClurg* plaintiffs filed their second amended complaint, in which they alleged that Mallinckrodt processed uranium at the SLDS and that radioactive residue material generated at SLDS was transported first to SLAPS and then to Latty Avenue. Compl. at ¶ 42 (citing Ex. I, *McClurg v. MI Holdings*, No. 4:12CV00641, Second Amended Compl.) (Jan. 10, 2014)). They further alleged that Cotter acquired the radioactive material at Latty Avenue and had most of the material shipped to Colorado, with the remaining material shipped to the West Lake Landfill. *Id.* And the plaintiffs alleged that Cotter's activities between 1969 and 1973 caused the radioactive material to be released into St. Louis County, contaminating the air, soil, and surface and ground water near Latty Avenue and West Lake Landfill. *Id.* The Second Amended Complaint in *McClurg* alleges negligent, grossly negligent, and reckless activities by Cotter and other owners of the radioactive wastes that allegedly resulted in the harm to the *McClurg* plaintiffs. *See* Ex. I, at ¶¶ 45-53, 65-68.

Cotter does not allege (nor could it) that it presented the information and documents connected with *McClurg* lawsuit to DOE, or that it tendered the litigation for DOE indemnification or representation. Instead, Cotter merely notes that "DOE was notified of the *McClurg* action no later than March 2012." *See* Compl. at ¶ 38 Cotter does not state who notified DOE or how it did so. Moreover, Cotter states that, six years into the *McClurg* litigation, it was the Court, and not Cotter, who sought DOE's involvement in settlement discussions with the *McClurg* parties. *Id.* ¶¶ 46-47. In September 2018, Cotter and the *McClurg* plaintiffs entered into a settlement agreement to resolve the public liability claims. Compl. ¶ 48.

Cotter alleges that it is entitled to $14,961,418 in indemnification costs for attorney fees, litigation-related expenses, and settlement payments. Compl. p. 1 and ¶¶ 48-52, 59, 74.

## ARGUMENT

### I. Standard Of Review

#### A. Motion To Dismiss Pursuant To Rule 12(b)(1)

A motion to dismiss for lack of standing pursuant to RCFC 12(b)(1) questions whether the court has jurisdiction to adjudicate the merits of the underlying dispute. *Warth v. Seldin*, 422 U.S. 490, 498 (1975); RCFC 12(b)(1). The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). "To survive a motion to dismiss for lack of standing, a complaint must contain sufficient factual matter that would plausibly establish standing if accepted as true." *Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1355 (Fed. Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss. *Dyck v. Albertelli Law*, 98 Fed. Cl. 624, 630 (2011). The Supreme Court has stated that, while the pleading standard does not require "detailed factual allegations," it does require more than "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

#### B. Motion To Dismiss Pursuant To Rule 12(b)(6)

"A motion to dismiss for 'failure to state a claim upon which relief can be granted' is appropriate under RCFC 12(b)(6) 'when the facts asserted by the claimant do not entitle [it] to a legal remedy.'" *Diaz v. United States*, 156 Fed. Cl. 270, 274 (2021) (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)). In considering a motion to dismiss for failure to state a claim, the Court must "accept as true all of the allegations in the [pleading]" and "indulge

all reasonable inferences in favor of the nonmovant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). "For a claim to be properly stated, the pleading 'must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.'" *Diaz*, 156 Fed. Cl. at 274 (quoting *Ashcroft*, 556 U.S. at 678. Thus, only a pleading stating a plausible claim for relief survives a motion to dismiss. *Ashcroft*, 556 U.S. at 678.

## II. Count I Fails To State A Claim For Statutory Indemnification Because It Fails To Plead The Basis Of Either Of The Two Avenues For Statutory Indemnification

In Count I, Cotter invokes the PAA as the sole basis for its claim that the United States is obligated to pay Cotter's litigation costs in *McClurg*. *See* Compl. ¶¶ 53-59. The PAA has two avenues for Government indemnification: pursuant to a contract with the United States under § 170(d); or pursuant to a license in which an indemnification agreement is included under § 170(a). Cotter does not allege it is entitled to indemnification under either pathway in the first instance. It does not allege that it was involved in Mallinckrodt's contract with the Government, and it acknowledges that it has no right to indemnification pursuant to its license with AEC. Instead, Cotter posits a free-floating right to indemnification that flows from the PAA's definitional provisions concerning a "person indemnified," using that definition to expand the Government's indemnification liability beyond the strictures and limitations set forth in the PAA in §§ 170(d) and 170(a).

Specifically, Cotter claims that it meets the definition of both a "person" and "person indemnified" as defined in the PAA. *Id.* at ¶¶ 55-56. It then claims that *McClurg* was a "public liability action" pertaining to a "nuclear incident" as defined by the PAA. *Id.* at ¶ 58. Cotter then concludes that, because a "person indemnified" (or any "other person" who faces public

liability) is entitled to indemnification for costs arising from a public liability action, it is entitled under the PAA to be indemnified for its litigation costs in *McClurg*. *Id.* at ¶ 57.

Scrutinized, however, Cotter proposes an interpretation of the PAA and the phrase "person indemnified" whereby "any person" who obtains radioactive material originally the subject of a Government contract is entitled to Government indemnification if the public is harmed by that material. *See* Compl. ¶ 5 (arguing that the PAA provides indemnification "for public liability arising from, *inter alia*, ***any nuclear incident involving the 'material'*** produced or delivered under the Contract.") (emphasis added); *see also id.* ¶ 57 (any "person indemnified" is entitled to indemnification by the Government "for its costs of settling and defending any action for public liability" arising from radioactive material). That is, Cotter proposes a theory of Government indemnification liability that runs with the radioactive material. And that liability falls upon the Government irrespective of the private purchase and ownership of the material, how the public became harmed by the material, and express statements by the Government in its sale documents disavowing future responsibility for the material.

Cotter's argument fails and Count I should be dismissed because Cotter misreads both the text and intent of the PAA. First, Cotter ignores that its claim satisfies neither of the two separate pathways for indemnification set forth in the PAA: one arising from a contractual relationship with the United States; and another arising from the grant of a license to a person in possession of radioactive material. *See* Pub. L. No. 85-256 at §§ 170(a), 170(d).

***In the contractual arena***, the United States' indemnification responsibilities are limited to activities with a nexus to a Government contract. As the PAA provides, AEC was only "authorized . . . to enter into agreements of indemnification with ***its contractors.***" *Id.* at 170(d) (emphasis added). And that limited authority was further restricted to contracts "for the

construction or operation of production or utilization facilities or other activities ***under contracts for the benefit of the United States*** involving activities under the risk of public liability." *Id.* at 170(d) (emphasis added). That limit comes as no surprise as Congress's intent in enacting the PAA was to incentivize private industry to help the United States carry out its atomic energy and defense programs. Nonetheless, Cotter makes no allegation, nor could it, that it was a contractor (or even a subcontractor) with AEC, or that its purchase, storage, transportation, and eventual misplacement and dumping of some of the contaminated soil furthered, or was in connection with, the activities the Government contracted with Mallinckrodt to perform. As such, Cotter's suggestion that the PAA was meant to provide mandatory indemnification to companies like Cotter, whose business involved the downstream, private, and third-party purchase of radioactive material for its own commercial purposes, is incorrect.

***In the licensing arena*** (where an entity must obtain a license to lawfully possess certain radioactive material), the PAA sets up a regime whereby Government indemnification *could* be provided to licensees. *See* Pub. L. No. 85-256, § 170(a). But the AEC, in its discretion, did not require private financial protection as a condition of Cotter's license. Thus, under the terms of the PAA, Cotter did not enjoy Government indemnification for its undertakings as a licensee.

Importantly, Cotter's invocation of PAA liability disregards the fact that Continental (an unrelated, prior possessor of the radioactive material) purchased the material from AEC through a bill of sale that expressly disavowed Government responsibility for the material.

Cotter's broad interpretation of the PAA fails because it cannot reconcile its claims of general indemnification obligations (allegedly carried along with the radioactive material generated by Mallinckrodt) with the specific provisions of the PAA in § 170(a) and § 170(d) that limit Government indemnification liability. Because Cotter's claim depends on that fundamental

misreading of the PAA, it fails to state a claim upon which relief can be granted. Accordingly, this Court should dismiss Count I.

### A. <u>Count I Fails To Plead Cotter is Eligible for Contractual Indemnification</u>

#### 1. <u>The PAA's Contractual Indemnification Provisions</u>

The PAA at § 170(d) provided the statutory authorization for AEC to provide indemnification agreements with its contractors. At the time of the execution of SA 124, AEC was only authorized by the PAA to enter into indemnification agreements with contractors performing activity **for the benefit of the United States**:

> [T]he Commission is authorized . . . to enter into agreements of indemnification with its contractors for the construction or operation of production or utilization facilities ***or other activities under contracts for the benefit of the United States*** involving activities under the risk of public liability for a substantial nuclear incident. In such agreements of indemnification, the Commission may require its contractor to provide and maintain financial protection of such a type and in such amounts as the Commission shall determine to be appropriate to cover public liability arising out of or in connection with the contractual activity and shall indemnify the person indemnified against such claims above the amount of financial protection required.

Pub. L. No. 85-256 at 170(d) (emphasis added). The requirement of a nexus between a claimant's activity and a Government contract continues in the current version of the PAA. *See* 42 U.S.C. § 2010(d) ("[T]he Secretary shall … enter into agreements of indemnification … with any person who may conduct ***activities under a contract*** … that involve the risk of public liability ….") (emphasis added).

### 2. Mallinckrodt's Contract Incorporated The PAA Indemnification Provisions, Which Require A Nexus Between Contract Activity For The Benefit Of The United States And A Government Indemnification Obligation

A review of the contractual indemnification provisions in Mallinckrodt's contract is helpful in understanding the PAA's intended linkage between contractual activity undertaken for the United States' benefit and the Government's provision of indemnification. Supplemental Agreement 124 to the Mallinckrodt Contract incorporated a PAA authorized indemnification clause.[8] *See* Ex. A at DOE742-46; 48 C.F.R. § 952.250-70. In that SA, the United States agreed to indemnify the "Contractor" (Mallinckrodt) and "other persons indemnified" for claims of public liability as defined by subparagraph 3.b of that modification. *Id.* at DOE743 at ¶ 3.a. Subparagraph 3.b defines the scope of public liability as being that which "(i) arises out of or in connection with ***the*** **contractual activity**; ***and*** (ii) arises out of or results from" one of four circumstances. Ex. A at DOE743-44 (emphasis added). Cotter suggests, more specifically, that 3.b(4) provides the basis for finding a Government obligation to indemnify Cotter for its expenses in settling the *McClurg* litigation:

> The AEC later amended the Contract to include a Price-Anderson Act indemnification clause in which the United States expressly agreed to indemnify Mallinckrodt and any 'other person indemnified' for public liability arising from, *inter alia*, any nuclear incident involving the 'material' produced or delivered under the Contract.

Compl. ¶ 5.

---

[8] The language in this contract modification contains the language from the AEC's model indemnification provision for contractors. *See* Ex. J, Selected Materials on Atomic Energy Indemnification Legislation, Subcommittee on Legislation of the Joint Committee on Atomic Energy, Congress of the United States, 89th Congress, 1st Session (June 1965) at 86.

Citing 3.b(4), Cotter suggests that SA 124's indemnification provision covers any nuclear incident causing public liability involving the radioactive material generated through Mallinckrodt's contract. Compl. ¶ 5; *see* Ex. A at DOE744 at 3.b(i) and 3.b(ii)(4). But Cotter ignores the necessary nexus in the PAA between the activity contracted for under a United States' contract and the United States' indemnification obligation, as reflected in 3.b(i) of SA 124, which provides indemnification only where liability "arises out of or in connection with the contractual activity." Cotter had no contract with the United States; it had no contract or relationship with Mallinckrodt; and, most importantly, ***Cotter's purchase*** of the material from ***a third party*** and Cotter's ***activities*** using the radioactive material that resulted in public liability did not arise out of or in connection with ***the contractual activity*** of Mallinckrodt's contract with the United States.[9] In short, ***Cotter's activities*** utilizing the radioactive material were not undertaken for the United States' benefit.

Accordingly, Cotter's claim in Count I fails to meet the requirements for Government indemnification as set forth in the PAA (and in Mallinckrodt's Contract).

[9] Certainly, it is not our brief here that an entity must literally have a contract with the United States to be entitled to PAA indemnification. The court has recognized instances in which entities assisting in the performance of a contract that included a PAA indemnification agreement are entitled to PAA indemnification. For example, with respect to the Three Mile Island nuclear power plant litigation, entities who supplied "design, engineering, or maintenance services, or that were vendors of systems or equipment incorporated in the [nuclear power plant] facility," were provided with Government indemnification. *Kiick v. Metro. Edison Co.*, 784 F.2d 490, 491 (3d Cir. 1986). *Accord Smith v. Gen. Elec. Co.*, 938 F. Supp. 70, 74 (D. Mass. 1996). In this context then, where these entities worked on the very contract with respect to which the public liability arose, these entities met the definition of a "person indemnified." *Kiick*, 784 F.2d at 491; *Smith*, 938 F. Supp. at 74. Here, however, Cotter was not involved in Mallinckrodt's performance under its weapons-related AEC contract. And *Cotter's activities* involving the radioactive material it purchased from Commercial Discount and that led to its liabilities in the *McClurg* litigation did not arise out of or in connection with Mallinckrodt's Contract.

### 3. The PAA's Provisions Reflect The Legislative Intent Concerning The Scope Of The Government's Indemnification Responsibilities

By authorizing AEC to indemnify contractors and other "person[s] indemnified," Congress intended to ensure that Government activities in atomic energy, weapons production, and other areas of Government interest could be completed without the fear of uninsurable liability on the part of private contractors and other private actors participating in these arenas, while still providing sufficient protection to the public.

For example, a 1965 joint Congressional committee stated that: "The indemnity provisions of the Price-Anderson Act were designed to ***protect organizations participating in the atomic energy program*** and the public by assuring that in the event a serious accident were to occur funds would be available for the payment of damages." Ex. J at 1–2 (emphasis added). In other passages, the Joint Committee noted that AEC carried out the major portion of its activities through contractual arrangements with industrial organizations and educational institutions (*id.* at 41) and that "[t]his [indemnification] authority allows the Commission to provide protection to the industrial organizations ***which assist the Government in carrying out the atomic energy program*** and through them to the public." *Id.* at 42 (emphasis added). Therefore, although the scope of indemnification was broad, Congress nonetheless *recognized a necessary nexus between its indemnification responsibilities and the performance of contractual activities in furtherance of the United States' atomic energy program.*

To be sure, Congress intended there to be a "channeling of liability" to the Government *where appropriate*. The complaint invokes the specific phrase "channeling of liability," in arguing that ***all*** public liability claims resulting in legal liability are to be "channeled to one ultimate source of funds: Government indemnification." *See* Compl. ¶ 2. That argument appears to have been derived from a misunderstanding of congressional reports concerning the PAA and,

perhaps, even DOE's own 1999 report to Congress. For example, in a 1988 Senate Report, the Senate Committee on Environment and Public Works stated that the PAA "provided that any person who might be held liable for public liability resulting from a nuclear incident, including not only the party directly engaged in the activity that results in the nuclear incident but any other person as well, was to be indemnified under the Price-Anderson system – the so-called 'channeling of liability' or 'omnibus coverage' provisions of the Act." Senate Report No. 100-218 110th Cong., 2nd Sess. 1988, 1988 U.S.C.C.A.N. 1476, 1477.

DOE, in a 1999 report to Congress, made similar statements concerning the PAA's "channeling of liability":

> [T]he Price-Anderson Act channels to one source of funds (that is, the DOE indemnification) the payment of all claims arising from the legal liability of any person for a nuclear incident. This 'economic channeling' eliminates the need to sue all potential defendants or to allocate legal liability among multiple potential defendants. Economic channeling results from the broad definition of 'persons indemnified' to include any person that may be legally liable for a nuclear incident, regardless of whether they have any contractual or other relationship with DOE.

Ex. K, DOE Report to Congress on the PAA (March 1999) at 12.[10]

Importantly, however, DOE cabined its statements, noting in the same 1999 Report that the "channeling" of liability through indemnification by the Government is not absolute and is not meant to be available to all persons facing public liability with respect to radioactive material. Thus, later in the same report to Congress, DOE provided a more specific description of its indemnification obligations, stating that DOE indemnification "covers any arrangement ***that is contractual in nature <u>and</u> that DOE uses to secure a <u>direct benefit for its account</u>*** in furtherance of its missions." *Id.* at 19 (emphasis added). DOE further reported that: "[*t*]*he DOE*

[10] Also available at https://www.energy.gov/sites/prod/files/gcprod/documents/paa-rep.pdf.

*indemnification **does not cover commercial activities that are not for the account of DOE***, even if such activities take place on DOE property under a lease or other arrangement with DOE." *Id.* (emphasis added). Therefore, DOE's report to Congress noted both the PAA's indemnification provisions ***and*** the qualifications limiting the scope of that indemnification. DOE stated that Government indemnification requires that there be a contractual relationship with the Government ***and*** that the contract provides a direct benefit for DOE. Thus, DOE understood, as evidenced in its report to Congress, that commercial activities that are not for the benefit of DOE are *not* covered by DOE's PAA indemnification obligations.

DOE's position is entirely consistent with the PAA's provisions that provided the AEC with authority to enter into indemnification agreements only where the underlying contractual activities are undertaken ***for the benefit of the United States***. *See* Pub. L. No. 85-256 at 170(d).

#### 4. Because Cotter Was Not A Government Contractor With Respect To The Radioactive Material, And Its Activities Were Not For The Government's Benefit, Cotter Is Not Entitled To Government Indemnification

Cotter's complaint makes no allegation that its activities purchasing the radioactive material or, once it purchased the material, storing and transporting it (for example, from the Latty Avenue site to the West Lake Landfill) were for the benefit of the United States. Nor could it. Cotter purchased the radioactive material for its own commercial purposes, transporting most of the material to its facilities in Canon City, Colorado. Compl. ¶ 6. As alleged in *McClurg*, Cotter's liability with respect to the West Lake Landfill was a result of its independent decisions to mix the radioactive material that it purchased with topsoil and to dispose it in the West Lake Landfill. *See* Ex. I, ¶ 51. Certainly, the *McClurg* litigation is not based upon allegations concerning work Cotter performed for the United States, but rather Cotter's "grossly negligent" disposal of the source material in the St. Louis area. *Id.* ¶¶ 45-53, 65-68.

Cotter's disposal of that waste material in the West Lake Landfill was not an activity that "arises out of or in connection with ***the*** contractual activity" of Mallinckrodt as it processed uranium, because Cotter's disposal did not further the performance of ***the*** Mallinckrodt Contract. Furthermore, even if Cotter were to claim that some of its liability in *McClurg* stems from its activity at Latty Avenue (*i.e.,* storing and drying the radioactive material and transporting it to Colorado), that was also an independent commercial activity that Cotter chose to engage in for its own profit, and not activity that facilitated the Mallinckrodt contract.

The closest the complaint comes to alleging an activity for the benefit to the United States is at best an implication. *See* Compl. ¶ 6 ("Cotter later acquired apportion of this material from the Government's successor in title."); *id.* at ¶¶ 16-20 (detailing the Government's efforts to sell the radioactive source material and noting that, with the sale of the material, the Government "could save approximately $400,000" from selling the material rather than move it to a new storage location at Weldon Springs).

But this implied benefit assertion fails, first, because the Government did not sell the radioactive material to Cotter. The Government sold the material in 1966 to Continental. Compl. ¶ 22; Ex. C. Title then passed, with the default of Continental's loan, to Continental's lender, Commercial Discount. *See* Ex. L, Residue Purchase Agreement (June 9, 1967) at A(1), (B(1)(A). Cotter then came into possession of some of the Commercial Discount-owned radioactive material "[a]t various times between 1967 and 1969." *Id.* And "[i]n December 1969, Cotter acquired the material remaining at Latty Avenue" (*id.*) from Commercial Discount. Cotter did not acquire the source material from the AEC, so even if there was "a benefit" to the Government in its sale of the material (if an arms-length sales transaction can be truly considered as bestowing a "benefit"), it was a benefit that Cotter did not provide.

Failing to plausibly assert any Government benefit from its activities, Cotter simply ignores that requirement, arguing from whole cloth that the phrase "person indemnified," as defined in the PAA, means, without limitation, "any other person who may be liable for public liability." Compl. ¶ 2 (citing 42 U.S.C. 2014(t)). Thus, Cotter's argument fails because it cannot reconcile its unlimited definition of "persons indemnified" with limits the PAA itself places on that definition, *i.e.*, that the statute's contract-based indemnity requires an activity in connection with a Government contract for the benefit of the Government. *See* Pub. L. No. 85-256 at 170(d); 42 U.S.C. 2010(d).

That failure violates the principal of statutory interpretation that a statute should be interpreted to give meaning to all its parts and that specific provisions control over broad provisions. "[I]t is a basic principle of statutory construction that a specific" provision "controls over a general provision . . . particularly when the two are interrelated and closely positioned[.]" *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981). *Accord Braun v. Dep't of Health & Hum. Servs.*, 998 F.3d 1312, 1318 (Fed. Cir. 2021); *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[Where] a general authorization and a more limited, specific authorization exist side-by-side[,] the canon avoids ... the superfluity of a specific provision that is swallowed by the general one, violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." (internal quotation marks and citation omitted)); *Wash. Mkt. Co. v. Hoffman*, 101 U.S. 112, 115-16 (1879) ("'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"); *Parkinson v. Dep't of Justice*, 874 F.3d 710, 716 (Fed. Cir. 2017).

Thus, this Court should view the PAA's indemnification provisions in the context of the entire Act, and not based simply upon an uncontextualized definition of "person indemnified." "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Home Depot U. S. A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) (citing *Davis v. Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989). Simply put, a "person indemnified" must be an entity or person undertaking activities in connection with a United States' contract as set forth in § 170(d), or, as discussed below, in connection with a license in which the requirements for indemnification in § 170(a) are met.

**C. Cotter Also Fails To Plausibly Plead Indemnification Under The PAA's Licensee Indemnification Provision**

Cotter also fails to plausibly plead a cause of action under the PAA's only other source of indemnification – that available to licensees required to obtain private insurance. *See* 42 U.S.C. § 2210(a) ("Requirement of financial protection for licensees"). To be sure, Cotter had a license, which was a prerequisite for any entity that sought to possess source material. *See* Ex. F. But Cotter did not have a license that would provide automatic indemnification as described in Section 2210(a).

**1. The PAA Required Privately Provided Indemnification As A Prerequisite For Government Indemnification Of Licensees**

Pursuant to the PAA, licensees were extended Government indemnification only if they were required by the AEC or by statute to obtain financial protection (i.e., private insurance). And if licensees were so required, then the PAA's indemnification provisions would apply, and they were required to enter into an indemnification agreement directly with the Government:

> Each license issued under [specified sections] and each construction permit issued under [a specified section] shall, and

> each license issued under [specified sections] may, have as a condition of the license a requirement that the licensee have and maintain financial protection of such type and in such amounts as the Commission shall require … to cover public liability claims. *Whenever such financial protection is required, it shall be a further condition of the license that the licensee execute and maintain an indemnification agreement in accordance with subsection 170c.*

Pub. L. No. 85-256, § 170(a) (emphasis added).

Thus, pursuant to the PAA, the AEC could have required that Cotter maintain financial protection for public liability claims and doing so would have triggered an obligation for Cotter to enter into a PAA indemnification agreement, which would have provided Government indemnification of Cotter's liability costs above that provided in its privately obtained financial protection.

**2. Cotter Did Not Obtain Privately Provided Indemnification And Was Not Ordered To Do So In Connection With Its Possession Of The Radioactive Material And Thus It Was Not Entitled To Government Indemnification**

Here, however, Cotter was not required by the AEC or statute to obtain financial protection in connection with its activities involving the radioactive material. And Cotter makes no allegation otherwise in its complaint. Instead, Cotter admits that its "AEC license did not provide for government indemnification or require the company to maintain financial protection for public liability claims." Compl. ¶ 22. Cotter's acknowledgment that the AEC did not provide for Government indemnification essentially pleads its argument away.[11]

---

[11] The United States Court of Appeals for the Third Circuit has recognized that, despite the broad definition of a "person indemnified," the substantive indemnification provisions only pertain, in the licensing context, to those licensees who possess their own financial protection:

> The statutory definition of "persons indemnified" includes "any ... person who may be liable for public liability." 42 U.S.C. § 2014(t). Although the substantive indemnification provisions incorporate this definition, they ***can be read as extending only to accidents involving licensees who are required to carry financial***

### D. Cotter's Theories Of Indemnification Liability Ignore That Continental Purchased The Radioactive Material Through A Bill Of Sale That Expressly Disavowed Government Responsibility For The Material

Not only is there no statutory Government indemnification available to Cotter as a licensee in the circumstances of this case, as discussed above, the chain of sales transactions that initially involved the AEC and Continental show that the United States did not intend to permit the purchasers of the radioactive material from the AEC to obtain, through the purchase, a right of Government responsibility or indemnification for any harm caused by the material. Indeed, the bill of sale for the radioactive material sold by AEC to Continental, and the license provided to Cotter when it eventually purchased that material from Commercial Discount, underscore that the United States understood that the PAA's statutory indemnification provisions did not apply to a mere purchaser (such as Cotter) of the material generated through Mallinckrodt's work for the Government. And these facts demonstrate that it is entirely implausible that the United States and Mallinckrodt intended to provide later downstream purchasers of the radioactive material with indemnification rights as third-party beneficiaries of Mallinckrodt's Contract.

> ***protection.*** *See id.* § 2210(c); *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 251–52 n. 12, . . . (1984) (government indemnification available only to those required to maintain financial protection). There appears to be some tension between this reading of § 2210(c) and Congress' expressed intent of assuring compensation for every victim of a nuclear incident.

*In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 873 n.4 (3d Cir. 1991) (Scirica, J., concurring) (emphasis added).

**1. The AEC Sold The Radioactive Material To Continental Disavowing Any Responsibility For Harm Resulting From The Material**

The Bill of Sale between AEC and Continental stated that the radioactive material was being sold "as is." Ex. C ¶ 3. And more explicitly, the Bill of Sale stated that the AEC was not warranting that the materials would *not* cause injury:

> Neither the Government, the Commission, nor persons acting on behalf of the Commission warrant the material sold to the Purchaser under this contract (i) will not result in injury or damage when used for any purpose, or (ii) are of merchantable quality, or (iii) are fit for any particular purpose.

*Id*.

The Bill of Sale further stated that title to the material transferred to Continental with the sale and that *Continental would assume full responsibility* for the care and custody of the material after the passage of title. *Id.* ¶¶ 8, 10. And the parties agreed that there were no other agreements between the parties outside of the Bill of Sale. *Id.* ¶ 11. Thus, there is nothing in the Bill of Sale that indicated that the United States would indemnify Continental with respect to any public liability resulting from the use, in any manner, of the radioactive material.

Again, the fact of the matter here is that Cotter did not purchase the material from the AEC. Continental made the purchase, and, as a creditor, Commercial Discount took possession of the radioactive material. *See* Ex. D, L. In June 1967, Commercial sold the radioactive material to Cotter. *See* Compl. ¶ 6 (noting that Cotter acquired a portion of the material from the "Government's successor in title"); Ex. L. The Residue Purchase Agreement between Commercial Discount and Cotter notes, among other things that:

- Commercial Discount is the owner of the residue material. Ex. L ¶ A(1);
- Commercial Discount agreed to indemnify Cotter from all suits and liabilities "arising from or related to claims of third parties against the residue . . . attributable to the period prior to delivery." *Id.* ¶ 1(b).

In August 1969, Cotter purchased the remaining residue material from Commercial Discount, through a second agreement that superseded the June 1967 Residue Agreement. *See* Ex. D at ¶ A(6). This agreement noted that Commercial Discount, as the seller, "[s]hall have good and marketable title" to the residual material (*id.* ¶ B(10)) and it again stated that Commercial Discount agreed to indemnify Cotter with respect all suits and liabilities "arising from or related to claims of third parties against [Cotter] . . . attributable to the operation of the Missouri site for the period prior to the Closing Date." *Id.* ¶ B(10)(b)).

Nowhere in the sales contracts between Commercial Discount and Cotter is there any acknowledgment, recognition, promise, or even mention of an indemnity obligation of the United States that would be accompanying the transfer of the material from Commercial Discount to Cotter. Thus, there is no reason to believe (and certainly no allegations asserted by Cotter) that the material, once transferred from Continental to Commercial Discount, carried with it an accompanying Government indemnification obligation.[12] And Cotter makes no allegation in its complaint that it purchased the radioactive material from Commercial Discount in reliance upon a promise of indemnification from the Government.[13]

**2. Cotter, As A Later Downstream Purchaser Of The Material Did Not Obtain Rights To Government Indemnification Along With Its Purchase – Or With Its Receipt Of A License**

Cotter does not allege that its purchase of the radioactive material from Commercial Discount carried with it, as part of the purchase, any right to Government indemnification. Nor

[12] Certainly, private parties have no power to unilaterally introduce or provide for Government indemnification as part of a sales contract, and Cotter does not claim otherwise.

[13] Nor does it allege that it purchased the radioactive materials from Commercial Discount in reliance upon the contract between Mallinckrodt and the Government.

is there any evidence that the license that Cotter obtained from AEC carried with it any Government indemnification. *See* Ex. F. And to be sure, where, as here, the Government sold the radioactive material, disavowing future responsibility for the material, a latter downstream buyer of that material, such as Cotter, cannot claim that it is entitled to PAA indemnification as "a person indemnified."

* * * * *

Given the foregoing, Cotter fails to state a claim upon which relief can be granted with respect to Count I because it cannot show that, pursuant to the PAA, it was entitled to Government indemnification in connection with its license. Nor, as discussed above, does it state a claim for indemnification pursuant to the PAA with respect to the Mallinckrodt Contract. Accordingly, this Court should dismiss Count I of Cotter's complaint pursuant to RCFC 12(b)(6).

## III. Cotter Fails To Plausibly Allege It Was An Intended Beneficiary Of Mallinckrodt's Contract With The United States

In Count II, Cotter alleges that it is entitled to indemnification for its costs in the *McClurg* litigation as an intended third-party beneficiary of the Government's contract with Mallinckrodt. Compl. ¶¶ 60-74. That the parties to that contract were even thinking about Cotter, which had no contract with the United States, no contract with Mallinckrodt, and did not obtain the radioactive material from either, is the height of implausibility. To suggest that the parties intended, as if they could, that the PAA would apply to anyone who might ever be sued for the effects of radiation is equally implausible. As with Count I, Cotter's allegations in Count II boil down to a claim that the right to Government indemnification for a "nuclear incident" travels with the radioactive material, irrespective of the PAA's statutory qualifications and limitations, and irrespective of who holds title to the material. In short, because Cotter cannot

show that the United States and Mallinckrodt intended to provide a downstream, third-party purchaser of radioactive material with a promise of Government indemnity, Cotter's third-party beneficiary claim fails.

Moreover, Cotter's third-party beneficiary claim fails because Cotter has not even alleged that the Government breached Mallinckrodt's contract, a necessary condition for a third-party beneficiary claim. Finally, because Cotter is not a third-party beneficiary of Mallinckrodt's contract, it also lacks standing and therefore Count II should be dismissed on that ground.

### A. <u>The Standards Concerning Third-Party Beneficiary Claims</u>

"[T]o have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States." *P. Gas and Electric Co. v. United States*, 838 F.3d 1341, 1350 (Fed. Cir. 2016). As such, "[t]he [G]overnment consents to be sued only by those with whom it has privity of contract." *Erickson Air Crane Co. of Washington, Inc. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) (emphasis added).

Cotter does not allege that it is in privity of contract with the Government. Instead, Cotter invokes the exception to the privity requirement that arises when a third-party beneficiary sues the United States pursuant to a contract between the Government and another party (here, Mallinckrodt). This exception "allow[s] [for] suit against the government by an intended third-party beneficiary despite the lack of privity." *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005). But third-party beneficiary status is an "exceptional privilege" that "should not be granted liberally." *Id.* at 1259 (*citing German Alliance Ins. Co. v. Home Water Supply Co*., 226 U.S. 220, 230 (1912)). "In order to prove third-party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Id. See also Astra USA, Inc.*

*v. Santa Clara County*, 563 U.S. 110, 117 (2011); *G4S Technology LLC v. United States*, 779 F.3d 1337, 1341 (Fed. Cir. 2015). A contract may establish third-party beneficiary status by either specifically identifying the intended beneficiary or naming a class of intended beneficiaries. *Flexfab*, 424 F.3d at 1260.

**B. Cotter Has Not Sufficiently Alleged, Nor Can It Show, That It Was An Intended Beneficiary Of The Government's Contract With Mallinckrodt**

The Mallinckrodt Contract does not identify Cotter as an intended beneficiary. Nor is that a surprise, as: (1) Cotter was a downstream purchaser of the radioactive material, which was initially sold by the Government to Continental with an express disavowal of Government responsibility for the material (*see above* at 30-32);[14] (2) Cotter's activities utilizing the radioactive material were not undertaken for the benefit of the United States' contract with Mallinckrodt but instead for Cotter's own private commercial purposes (*see above* at 25-28); and (3) Cotter's license did not require the acquisition of private financial protection and thereby provide indemnification with respect to Cotter's possession of the radioactive material. *See above* at 28-29.

Nonetheless, Cotter argues that it is a member of the class of "persons indemnified," which includes, according to Cotter, "all other persons" facing liability from a nuclear incident. Compl. ¶¶ 64-66. The problem is that Cotter puts no meat on that bone, failing to suggest any reason why the parties to that contract would have, between them, gratuitously agreed to indemnify any person facing such liability. Certainly, AEC had no authority or motive to offer

---

[14] Cotter essentially (and implausibly) posits that it was the parties' intent when the indemnification agreement (SA 124) was inserted into the Mallinckrodt Contract to, in part, bar the United States from selling the radioactive material in the future with contractual conditions that assign responsibility for the material to the purchaser (i.e., here, Continental).

such unlimited indemnification in the face of its limited authority to extend any such indemnification.

By failing to allege, show, or demonstrate an intent by the Government and Mallinckrodt to disregard the limits of the PAA and expand the Government's indemnification obligations outside the scope of that statute, Cotter has failed to state a third-party beneficiary claim.

### C. Cotter Has Not Alleged That The Government Breached The Contract

Even if Cotter were able to show that it was an intended beneficiary of the Government's contract with Mallinckrodt, its complaint fails to state a claim for relief because Cotter does not allege that the Government breached its contract with Mallinckrodt. In its complaint, Cotter has merely presented a claim for its costs *in this Court* as a third-party beneficiary of the Mallinckrodt Contract. But Cotter makes no allegation that it previously presented a claim to the United States for the indemnification of Cotter's alleged litigation expenses in *McClurg*. And thus, Cotter cannot allege (nor does it) that the Government rejected Cotter's claim for indemnification, thus (per Cotter's paradigm) breaching the Mallinckrodt Contract.

Accordingly, even assuming the other faulty premises to Cotter's claim for the sake of argument, because Cotter has not alleged or shown an actual breach of the Mallinckrodt Contract by the United States in the first instance, Cotter cannot present a third-party beneficiary claim in this Court. "If a plaintiff can establish privity or third party beneficiary status, a plaintiff must also be able to establish 'an obligation or duty arising out of the contract, *a breach of that duty*, and damages cause by the breach.'" *Doyle v. United States*, 129 Fed. Cl. 147, 154-55 (2016) (emphasis added) (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)). *See also Loc. 1303-362 of Council 4 v. KGI Bridgeport Co.* No. 3:12CV1785 AWT, 2013 WL 4735584 at * 7 (D. Conn. Sept. 3, 2013) (where there was no

breach of contract there is no liability to third-party beneficiaries); *Am. Online Latino v. Am. Online, Inc.*, 250 F.Supp.2d 351, 363 (S.D.N.Y. 2003) (it is unnecessary to consider whether plaintiff is a third-party beneficiary where the complaint fails to allege a breach of contract).

Because Cotter has not alleged that the Government breached the Mallinckrodt contract, Cotter's third-party beneficiary claim must be dismissed for failure to state a claim.

### D. This Court Should Dismiss Count II For Lack Of Standing

Because, as we demonstrate above, Cotter fails to state a claim with respect to its third-party beneficiary claim, and it is not in privity of contract with the United States, it also fails to show that it has standing to assert a third-party beneficiary claim based upon the Mallinckrodt Contract with the United States. *See, e.g., City of Fresno v. United States*, 148 Fed. Cl. 19, 31 (2020) (where intervenor plaintiffs were not found to be third-party beneficiaries of contracts, they were found to have no standing to contest the terms of the contract between the Government and the original contractual plaintiffs). *See also Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1296 (Fed. Cir. 2022) (because the "'government consents to be sued only by those with whom it has privity of contract'" where plaintiff's claim failed to implicate a breach, plaintiff's claim must be dismissed on standing (privity) grounds) (quoting *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984)).

Accordingly, this Court should also dismiss Count II for lack of standing.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court dismiss Cotter's complaint.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ Steven J. Gillingham, for
FRANKLIN E. WHITE, JR.
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-7972
Facsimile: (202) 514-8640
john.roberson@usdoj.gov

Dated: August 25, 2022

Attorneys for Defendant