No. 22-414C
Judge David A. Tapp

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

COTTER CORPORATION (N.S.L.),

Plaintiff,

v.

THE UNITED STATES OF AMERICA

Defendant.

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**MILLER & CHEVALIER CHARTERED**

Alejandro L. Sarria
Jason N. Workmaster
Connor W. Farrell
Alexandra S. Prime
MILLER & CHEVALIER CHARTERED
Black Lives Matter Plaza
900 16th Street NW
Washington, DC 20006
202.626.5822 (Direct)
202.626.5801 (Facsimile)
asarria@milchev.com (Email)

Dated: September 22, 2022

*Attorneys for Plaintiff Cotter Corp. (N.S.L.)*

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....................................................................................................1

QUESTIONS PRESENTED....................................................................................2

STANDARD OF REVIEW .....................................................................................3

STATEMENT OF THE CASE................................................................................3

I. The Statutory Framework ..................................................................................3

A. The Atomic Energy Act ..................................................................................3

B. The Price-Anderson Act ..................................................................................4

II. The PAA Indemnity Agreement .......................................................................7

ARGUMENT ..........................................................................................................9

I. Cotter's Complaint States A Claim For PAA Statutory Indemnity (Count I)...................................................................................................9

A. The Facts In The Complaint Are Sufficient To State The Essential Elements Of A Statutory Indemnity Claim Under PAA Section 170(d)...................................................................9

B. For Domestic Nuclear Incidents, PAA Indemnity Is Not Limited To Persons Who Face Public Liability Due To Their Activities Under A Government Contract.......................................11

1. The PAA's Plain Text Shows That PAA Indemnity Is Not Limited To Persons Who Perform Activities In Support Of A PAA-Covered Contract.......................................12

2. The PAA's Legislative History Confirms That PAA Indemnity Is Not Limited To Persons Who Perform Activities In Support Of A PAA-Covered Contract ......................16

C. Cotter Is Eligible For Statutory Indemnity Under PAA Section 170(d), Even Though It Was Not Issued An Indemnification Agreement Under PAA Section 170(a)...........................20

D. The Sale And Licensing Documents The Government Cites Are Irrelevant To Cotter's Claims For Statutory And Contractual Indemnity Under the PAA....................................................22

II. Cotter's Complaint States A Claim For Indemnification As An Intended Third-Party Beneficiary Of The PAA Indemnity Agreement (Count II) ..... 24

A. The Facts In The Complaint Are Sufficient To State A Third-Party Beneficiary Claim ..... 25

B. The Facts In The Complaint Are Sufficient To Support The Conclusion That The Government Breached The PAA Indemnity Agreement In *McClurg* ..... 27

C. Cotter Has Standing To Pursue Count II Because It Is An Intended Third-Party Beneficiary Of The PAA Indemnity Agreement ..... 30

CONCLUSION ..... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................3

*Bell Atl. Corp. v. Twombly*,
500 U.S. 544 (2007)....................3

*Bell/Heery v. United States*,
739 F.3d 1324 (Fed. Cir. 2014)....................28

*Cambridge v. United States*,
558 F.3d 1331 (Fed. Cir. 2009)....................3, 11

*Capitol Indem. Corp. v. 1405 Assocs., Inc.*,
340 F.3d 547 (8th Cir. 2003)....................10

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021)....................25

*Dobyns v. United States*,
91 Fed. Cl. 412 (2010)....................30

*G4S Tech. LLC v. United States*,
114 Fed. Cl. 662 (2014), *aff'd*, 779 F.3d 1337 (Fed. Cir. 2015)....................3, 30

*Gould, Inc. v. United States*,
935 F.2d 1271 (Fed. Cir. 1991)....................3, 11

*Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*,
420 F.3d 1317 (11th Cir. 2005)....................10

*Maine Cmty. Health Options v. United States*,
140 S. Ct. 1308 (2020)....................13

*McClurg v. Mallinckrodt, Inc.*,
No. 4:12-cv-00361-AGF (E.D. Mo.)....................*passim*

*Meyers v. United States*,
96 Fed. Cl. 34 (2010)....................11

*New York and Presbyterian Hosp. v. United States*,
881 F.3d 877 (Fed. Cir. 2018)....................13

*Nicely v. United States*,
23 F.4th 1364 (Fed. Cir. 2022) ....................................................................................10

*Premier Office Complex of Parma, LLC v. United States*,
916 F.3d 1006 (Fed. Cir. 2019)......................................................................................23

*San Antonio Hous. Auth. v. United States*,
143 Fed. Cl. 425 (2019) ...........................................................................................28, 30

*Simmons v. Himmelreich*,
578 U.S. 621 (2016)........................................................................................................16

*State of Montana v. United States*,
124 F.3d 1269 (Fed. Cir. 1997)......................................................................................26

*United States v. Stepp*,
67 F. App'x 107 (3d Cir. 2003) .....................................................................................10

**Statutes**

42 U.S.C. § 2014.................................................................................................................23

42 U.S.C. § 2014(t) ........................................................................................................15, 20

42 U.S.C. § 2210(d)(1)(A) ...................................................................................................21

42 U.S.C. § 2210(h) ..............................................................................................................28

Atomic Energy Act of 1946,
Pub. L. No. 585, ch. 724, 60 Stat. 755 (1946) ...............................................................3

Atomic Energy Act of 1954,
Pub. L. No. 87-615, § 11(r), 76 Stat. 409 (1962)........................................................4, 6

Price-Anderson Act of 1957,
Pub. L. No. 85-256, § 170(d), 71 Stat. 576 (1957) ........................................... *passim*

**Regulations**

48 C.F.R. § 44.101 (2013) ..................................................................................................12

**Rules**

Rule 12(b)(1) of the United States Court of Federal Claims ..........................................1, 2

Rule 12(b)(6) of the United States Court of Federal Claims ..........................................1, 2

**Miscellaneous Authorities**

94 Cong. Rec. S14579 (daily ed. Aug. 8, 1974) ....................18

*Arise*, *Black's Law Dictionary* (4th ed. 1951) ....................10

*Arise*, *Black's Law Dictionary* (11th ed. 2019) ....................10

*Connection*, *Black's Law Dictionary* (4th ed. 1951) ....................10

DOE Off. of Gen. Couns., Preparation of Report to Congress on Price-Anderson Act, 62 Fed. Reg. 68,272, 68,274 (Dec. 31, 1997) ....................21

*Garner's Dictionary of Legal Usage* (3d ed. 2011)....................10

*Oxford Dictionary of English* (3d. ed. 2010) ....................10

S. Rep. No. 85-296 (1957), *as reprinted in* 1957 U.S.C.C.A.N. 1803 ....................4

S. Rep. No. 87-1677 (1962), *as reprinted in* 1962 U.S.C.C.A.N. 2207 ....................7

S. Rep. No. 100-218 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 1476 ....................18

# INTRODUCTION

Plaintiff Cotter Corporation (N.S.L.) ("Cotter") hereby submits its Opposition to the Motion to Dismiss filed by Defendant, the United States of America (the "Government"), under Rules 12(b)(6) and 12(b)(1) of the United States Court of Federal Claims ("RCFC").

The Court should deny the Government's motion because Cotter's Complaint contains factual allegations that are more than sufficient to state a claim for indemnification under the Price-Anderson Act (the "PAA" or "Act") (Count I) and as an intended third-party beneficiary of the PAA indemnity agreement between the United States and Mallinckrodt Chemical Works ("Mallinckrodt") (Count II). The Government seeks to avoid its obligations by arguing that PAA indemnity is available only to a narrow universe of persons and by claiming that it never intended to indemnify persons like Cotter under its PAA indemnity agreement with Mallinckrodt. But none of the Government's arguments withstand scrutiny.

As to Count I (Statutory Indemnity), the Government claims that PAA indemnity is available only to persons with a "contract" or "relationship" that requires the performance of contractual activities for the Government's benefit. Not so. The Act does not impose such conditions for nuclear incidents that occur inside the United States like those at issue in *McClurg v. Mallinckrodt, Inc.*, No. 4:12-cv-00361-AGF (E.D. Mo.) ("*McClurg*"). Rather, for domestic nuclear incidents, PAA indemnity is and has always been available to a broader class of persons facing public liability, regardless of their contractual status, relationships, or activities. The plain language and legislative history of the Act clearly reflect this broad coverage and, until now, the United States has agreed with that interpretation of the statute. The Government's motion to dismiss Count I fails for this reason alone.

By extension, the Government argues that Cotter is ineligible for PAA indemnity because Cotter's material license and certain sale documents did not expressly say that the United States

would indemnify users of the radioactive material Mallinckrodt produced for the Government. This is another misdirection. The Complaint independently states a claim for statutory indemnity under PAA Section 170(d), so it is irrelevant that Cotter's material license did not also provide for indemnification under a different section of the Act. And even if the United States secretly meant to 'disavow' its indemnity obligations by later attempting to contract them away, those unstated intentions have no bearing on Cotter's claim for statutory indemnity (Count I) or its rights as an intended beneficiary of the PAA indemnity agreement (Count II). That is because Congress's original decision to indemnify persons like Cotter—as expressed in the Act and the still-valid PAA indemnity agreement—is controlling in this case.

Similarly, the Government argues that Count II (Contractual Indemnity) should be dismissed because, in its opinion, the United States and Mallinckrodt could not possibly have intended to benefit a third-party like Cotter. But this ignores that, in the PAA indemnity agreement, the United States and Mallinckrodt faithfully adopted the terms Congress developed for the Act. Congress wrote those terms with the clear intention to benefit persons like Cotter. That is enough to plead that Cotter is an intended third-party beneficiary of the PAA indemnity agreement. So, as to Count II, not only does the Government's RCFC 12(b)(6) motion fail, so does its related motion under RCFC 12(b)(1).

## QUESTIONS PRESENTED

1. Does Cotter's Complaint contain factual allegations that are sufficient to state a plausible claim for statutory indemnification under the PAA (Count I)?

2. Does Cotter's Complaint contain factual allegations that are sufficient to state a plausible claim for indemnification as an intended third-party beneficiary of the PAA indemnity agreement (Count II)?

## STANDARD OF REVIEW

Under RCFC 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that meets this standard will defeat a RCFC 12(b)(6) motion to dismiss if the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 500 U.S. 544, 570 (2007)) (citations omitted).

The "plausibility standard" is not a "probability requirement." *Id.* at 678. Rather, a claim is facially plausible when the Court has enough factual information "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, when weighing a motion to dismiss under RCFC 12(b)(6), "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009); *Gould, Inc. v. United States*, 935 F.2d 1271, 1273–74 (Fed. Cir. 1991). Further, when a complaint states a non-frivolous claim asserting third-party beneficiary status, the Court should deny a RCFC 12(b)(1) motion to dismiss the claim for lack of standing. *See G4S Tech. LLC v. United States*, 114 Fed. Cl. 662, 669 (2014), *aff'd*, 779 F.3d 1337 (Fed. Cir. 2015).

## STATEMENT OF THE CASE

### I. The Statutory Framework

#### A. The Atomic Energy Act

Congress enacted the Atomic Energy Act of 1946 amid the rising tensions of the coming Cold War. At the time, federal law created a government monopoly over the development of nuclear power in the United States. *Duke Power Co. v. Carolina Env't Study Grp., Inc.* 438 U.S. 59, 63 (1978) (citing Act of Aug. 1, 1946, ch. 724, 60 Stat. 755). "Within a decade, however, Congress concluded that the national interest would be best served if the Government encouraged

the private sector to become involved in the development of atomic energy for peaceful purposes under a program of federal regulation and licensing." *Id.*

The Atomic Energy Act of 1954 ("AEA") implemented this policy by authorizing the Atomic Energy Commission ("AEC") to enter into contracts and licenses with private companies for the production and management of nuclear energy. *Id.* By lifting the government monopoly over domestic nuclear activity, Congress hoped to "encourage the entrance of private industry into the program, and speed the further development of the peaceful uses of atomic energy." Ex. 1, S. Rep. No. 85-296 (1957), *as reprinted in* 1957 U.S.C.C.A.N. 1803, at CO 001.

But soon another "major roadblock" emerged: the threat of legal liability to private companies in the event that an accidental release of nuclear material caused injury to the public. *Id.* Concerned that the liability risks far exceeded the amount of available insurance, companies in the nuclear industry "informed Congress that they would be forced to withdraw from the field if their liability were not limited by appropriate legislation." *Duke Power Co.*, 438 U.S. at 64.

**B. The Price-Anderson Act**

Congress responded in 1957 by passing the PAA as an amendment to the AEA. *Id.* at 64. "The Act had the dual purpose of 'protect[ing] the public . . . and encourag[ing] the development of the atomic energy industry,'" *id.*, by making public funds available to cover damages caused by a domestic nuclear incident, *id.* at 88–89. To that end, Congress limited the aggregate liability arising out of a "nuclear incident" to the amount of private insurance available at the time. *Id.* at 65. It also allotted $500 million to fund Government indemnification of AEC contractors and "other persons indemnified," *id.*, and authorized the AEC:

> [T]o enter into agreements of indemnification with its contractors for the construction or operation of production or utilization facilities or other activities under contracts for the benefit of the United States involving activities under the risk of public liability for a substantial nuclear incident. In such agreements of

> indemnification the Commission may require its contractor to provide and maintain financial protection of such a type and in such amounts as the Commission shall determine to be appropriate to cover public liability arising out of or in connection with the contractual activity, and shall indemnify the persons indemnified against such claims above the amount of financial protection required . . .

Ex. 2, Price-Anderson Act of 1957, Pub. L. No. 85-256, § 170(d), 71 Stat. 576 (1957), at CO 038 ("Section 170(d)").[1]

Consistent with Congress's goals, the Act broadly defined the key terms used in Section 170(d). "Public liability" meant "any legal liability arising out of or resulting from a nuclear incident." *Id.* § 11(u) at CO 037; Ex. 3, Atomic Energy Act of 1954, 42 U.S.C. § 2014 (u) (1958) (as amended), at CO 045–46. "Nuclear incident" involved "any occurrence within the United States causing bodily injury, sickness, disease, or death, or loss of or damage to property, or for loss use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." *Id.* § 11(o) at CO 037; Ex. 3, § 2014(o) at CO 045. "Person," as used in the Act, included "any corporation" or "other entity" and any "legal successor" thereof. *See* Ex. 3, § 2014(q) at CO 045.

The PAA also broadly defined "person indemnified" to include not only "the person with whom an indemnity agreement is executed," but also "***any other person who may be liable for public liability***." Ex. 2, § 11(r) at CO 037; Ex. 3, § 2014(r) at CO 045 (emphasis added). Congress wrote this definition to "protect the public" by ensuring that federal funds are available in case an unaffiliated third party—rather than a person involved in performing a PAA-covered contract—were to cause a nuclear incident, applying, for example, if an airline's negligent

1 The Government twice misquotes the language in Section 170(d) using the singular phrase "the person indemnified." Gov. Br. at 7, 20. The Act uses the plural phrase "the persons indemnified." Ex. 2, § 170(d) at CO 038.

maintenance of "an airplane motor . . . cause[d] an airplane to crash into a nuclear reactor." Ex. 1 at CO 017 ("[U]nder this bill the public is protected and the airplane company can also take advantage of the indemnification."). For the same reason, Congress chose broad, flexible language for showing that a person's "public liability" is covered by the indemnity protections of the Act. Ex. 2, §170(d) at CO 038 (requiring the United States "to cover public liability ***arising out of or in connection with*** the contractual activity") (emphasis added); *infra* Section I.A (explaining the ordinary meaning of "arising out of," "arises out of," "in connection with").

Congress reiterated this purpose in 1962 when it amended the PAA to cover the occurrence of certain nuclear incidents outside the United States. Those amendments modified the definition of "person indemnified" to distinguish between persons who may be subject to public liability arising from a nuclear incident "within the United States" and persons facing liability for an incident "outside the United States." Ex. 4, Atomic Energy Act of 1954, Pub. L. No. 87-615, § 11(r), 76 Stat. 409, 410 (1962) (as amended), at CO 086. For incidents in the United States, "person indemnified" remained unchanged and continued to include "the person with whom an indemnity agreement is executed and any other person who may be liable for public liability." *Id.*

As to incidents outside the United States, however, Congress narrowed the potential pool of "person[s] indemnified" to "the person with whom an indemnity is executed and any other person who may be liable for public liability ***by reason of his activities under any contract with the Commission . . . or under any subcontract, purchase order or other agreement, of any tier, under any such contract.***" *Id.* (emphasis added). Congress explained this distinction as follows:

> Price-Anderson indemnity coverage has, from its inception extended to ***any person*** who may be liable for public liability. ***This coverage was intentionally broad since the primary purpose of the legislation was to protect the public*** . . . This reason, however, does not underlie the extension of Price-Anderson indemnity to incidents outside the United States. The principal purpose of this extended

> coverage is to protect AEC contractors and subcontractors. Therefore, coverage in [the amended portion of "person indemnified"] ***has been limited to the contractor*** himself, ***or to any other person*** who may be liable for public liability ***provided that the other person's liability results from his activities under a subcontract, or other agreement of any tier under the basic contract***.

Ex. 5, S. Rep. No. 87-1677 (1962), *as reprinted in* 1962 U.S.C.C.A.N. 2207, 2215-16, at CO 095 (emphasis added).

## II. <u>The PAA Indemnity Agreement</u>

The AEC and Mallinckrodt amended Contract No. W-14-108-Eng-8 ("Contract") on August 23, 1962 to incorporate a PAA indemnity agreement ("the PAA indemnity agreement"). Compl. ¶ 25; Gov. Br., Ex. A at 742-47. In making this amendment to the Contract, the parties expressed a common desire to include provisions that would provide PAA indemnity to Mallinckrodt and "others" for "public liability resulting from certain nuclear incidents," under Section 170 of the Act. Compl. ¶ 26; Gov. Br., Ex. A at 742.

The AEC and Mallinckrodt adopted the PAA's defined terms and wrote the indemnity agreement using the same language as a model indemnification form prepared by Congress. Comp. ¶ 27; Gov. Br. at 21 n. 8, Ex. J at 93–94. Under the PAA indemnity agreement, the United States agreed to compensate Mallinckrodt and "other persons indemnified," as follows:

> To the extent that the Contractor and any other persons indemnified are not compensated by any financial protection permitted or required by the Commission, the Commission will and does hereby indemnify the Contractor, and other persons indemnified, against (i) claims for public liability as described in Paragraph b. of this Section 3; and (ii) the reasonable costs of investigating and settling claims, and defending suits for damage for such public liability, provided that the Commission's liability under all indemnity agreements entered into by the Commission under Section 170 of the Act, including this contract, shall not exceed $500,000,000, including such reasonable costs, in the aggregate for each nuclear incident irrespective of the number of persons indemnified in connection with this contract.

Compl. ¶ 28; Gov. Br., Ex. A at 743. Consistent with Section 170(d), the PAA indemnity agreement covers public liability that "arises out of or in connection with the contractual activity" and "arises out of or results from," *inter alia*, a "nuclear incident which involves . . . material . . . produced or delivered" under the Contract. Compl. ¶ 29; Gov. Br., Ex. A at 743–44.[2]

Upon learning of a public liability action, the United States must determine if it "will probably be required to make indemnity payments" and, if so, decide if it will take charge of the defense and settlement of the action or collaborate with and then compensate the persons indemnified who are named as defendants. *Id.* ¶¶ 31–32. The United States' obligations under the indemnity agreement are enforceable, even if, for example, Mallinckrodt failed to provide notice to the United States Department of Energy ("DOE") of a public liability action. *Id.* ¶¶ 33–34.[3]

Congress passed the 1962 PAA amendments six days after the AEC and Mallinckrodt executed the original PAA indemnity agreement. *See supra* Section I.B. A few months later, the AEC and Mallinckrodt amended the indemnity agreement to adopt the changes Congress made in the 1962 legislation. This amendment included the updated definition of "person indemnified," which limited the indemnity to persons who perform activities in support of a contract subject to the PAA, but only as to nuclear incidents outside the United States. *See* Gov. Br., Ex. A at 748–50. The AEC-Mallinckrodt indemnity agreement remains in effect today. Compl. ¶ 34.

---

2 The AEC did not require Mallinckrodt to obtain financial protection to cover such public liability (e.g., in the form of private nuclear insurance). Compl. ¶ 30; Gov. Br., Ex. A at 743.

3 DOE assumed the AEC's obligations under the PAA and the PAA indemnity agreement in 1977. Compl. ¶ 35.

## ARGUMENT

### I. Cotter's Complaint States A Claim For PAA Statutory Indemnity (Count I)

The factual allegations in Cotter's Complaint are sufficient to state a claim for statutory indemnity under PAA Section 170(d), as shown below. In its motion, the Government argues that this statutory indemnity is limited to persons with certain contracts or relationships and who perform contractual activities that benefit the Government under a contract subject to the PAA. The Government also claims that certain documents, executed years after the PAA indemnity agreement, show that the United States never intended to indemnify persons like Cotter. These arguments fail, however, because they are contradicted by the plain text and legislative history of the PAA, the Government's prior interpretations of the Act, and the purpose of the PAA indemnity agreement implementing the Act.

#### A. The Facts In The Complaint Are Sufficient To State The Essential Elements Of A Statutory Indemnity Claim Under PAA Section 170(d)

As stated in the Complaint, Cotter was subject to "public liability" in *McClurg*, which involved damages claims against Cotter and Mallinckrodt for the alleged release of radioactive source material in the United States—i.e., a domestic "nuclear incident." Compl. ¶¶ 36, 41–43, 54, 58; Ex. 2, §§ 11(u), (o) at CO 037.[4]

Cotter's alleged liability "aris[es] out of or in connection" with Mallinckrodt's contractual activity because the *McClurg* claims were, in the first sense, grounded in Cotter's possession and use of the same radioactive source material that Mallinckrodt produced for the United States. Compl. ¶¶ 4–6, 12–15, 22–24, 36, 42–43. The PAA does not define the phrase "arising out of or in connection with," Ex. 2, § 170(d) at CO 037, though the ordinary meaning of those terms,

---

4 The *McClurg* action was filed against Cotter and Mallinckrodt's successor-in-interest.

together with the facts in the Complaint, clearly support a claim for relief that is plausible on its face, *Nicely v. United States*, 23 F.4th 1364, 1369 (Fed. Cir. 2022) ("When terms used in a statute are undefined, we give them their ordinary meaning.") (internal citations omitted).

In 1957 and today, the phrase "arising out of" ordinarily is understood as to "originate" or "stem" from, while "in connection with" generally means "relating" or "with reference to."[5] Here, the facts in the Complaint support the reasonable inference that Cotter's liability "originates" or "stems" from Mallinckrodt's production of the radioactive material because, without that contractual activity, the material would have never existed and the liability never formed. The broad phrase "arising out of" amply embraces this causal connection. Cotter's liability also "relates" or bears "reference to" Mallinckrodt's work for the AEC because, again, without the radioactive material, there is no public liability. This inextricable link easily fits the even broader phrase "in connection with," which requires only a logical relation.[6]

Cotter is a "corporation" and thus a "person" under the Act. Compl. ¶¶ 10, 55; Ex. 3, § 2014(q) at CO 045. Cotter also is a "person indemnified" because it is a "person" who was subject to the public liability claims discussed above, even though the AEC's indemnity agreement

---

5 Ex. 6 (*Arise*, *Black's Law Dictionary* (4th ed. 1951) (defining "arise" as to "originate"); *Connection*, *Black's Law Dictionary* (4th ed. 1951) (defining "connection" as "[t]he state of being connected…by dependence or relation"); *Arise*, *Black's Law Dictionary* (11th ed. 2019) (defining "arise" as "[t]o originate; to stem (from)"); *In connection with*, *Oxford Dictionary of English* (3d. ed. 2010) (defining "in connection with" to mean "with reference to [or] concerning"); *In connection with*, Garner's Dictionary of Legal Usage (3d ed. 2011) ("in connection with" is "invariably a vague, loose connective")).

6 *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1327 (11th Cir. 2005) (describing "the general consensus" that "'arising out of' requires some causal connection . . . but does not require proximate cause in the legal sense"); *Capitol Indem. Corp. v. 1405 Assocs., Inc.*, 340 F.3d 547, 550 (8th Cir. 2003) ("'[A]rising out of' may be established by a 'simple causal relationship'"); *United States v. Stepp*, 67 F. App'x 107, 108 (3d Cir. 2003) ("'[I]n connection with' is notable for its 'vagueness and pliability' . . . Connection 'can encompass any 'casual or logical relation or sequence'").

was with a different person (Mallinckrodt). Compl. ¶¶ 5, 7–8, 25–35, 56–57; Ex. 3, § 2014(r) at CO 045.

Having exercised its Section 170(d) authority to enter into this indemnity agreement, the United States is now mandated by statute to indemnify and compensate Cotter, as a "person indemnified," for the costs of settling and defending the *McClurg* public liability suit. Compl. ¶¶ 25–35, 26–59; *see also* Ex. 3, § 2210(d) at CO 074 ("In such agreements . . . the Commission . . . ***shall*** indemnify the persons indemnified against such [public liability] claims") (emphasis added); *Meyers v. United States*, 96 Fed. Cl. 34, 45–46 (2010) (holding statute is money-mandating if "it compels the payment of money upon the satisfaction of certain conditions").

Together, these factual allegations plainly state a claim for statutory indemnity under Section 170(d) of the PAA. *Cambridge*, 558 F.3d at 1335; *Gould, Inc.*, 935 F.2d at 1273–74.

### B. For Domestic Nuclear Incidents, PAA Indemnity Is Not Limited To Persons Who Face Public Liability Due To Their Activities Under A Government Contract

The Government accepts that *McClurg* was a public liability action involving "public liability" claims arising from a domestic "nuclear incident." And it does not dispute that Cotter is a "person" under the Act. Instead, the Government contends that Cotter is not a "person indemnified" and thus ineligible for statutory indemnity under Count I because: (1) Cotter did not have a "contract" or "relationship" with the AEC or Mallinckrodt, (2) Cotter did not perform contractual activities that benefited the United States under Mallinckrodt's Contract with the AEC; and (3) "Cotter's activities" with the radioactive material produced by Mallinckrodt did not "arise out of or in connection with the contractual activity" on the Contract. Gov. Br. at 22 n. 9, 25–28. These arguments must be rejected because the PAA does not impose such conditions.

1. The PAA's Plain Text Shows That PAA Indemnity Is Not Limited To Persons Who Perform Activities In Support Of A PAA-Covered Contract

The Government's position hinges on an overreading of the opening sentence in Section 170(d), which in 1957 stated that "the Commission is authorized . . . to enter into agreements of indemnification with its contractors for the construction or operation of production or utilization facilities or other activities under contracts for the benefit of the United States involving activities under the risk of public liability." Gov. Br. 18–20 (quoting Pub. L. No. 85-256, § 170(d), 71 Stat. 576 (1957)).

From this line, the Government infers that the universe of "persons indemnified" is limited to persons who have a "contract" or "relationship" with the Government or an indemnified contractor and who perform contractual activities that benefit the United States under a federal contract covered by the PAA. *Id.* at 7 n. 3, 18–19, 22, 22 n. 9, 25–28. In effect, the Government appears to argue that PAA indemnity is available only to prime contractors and their subcontractors since, as a practical matter, those are the only private entities with contracts and relationships that require the performance of contractual activities in support of such a contract. *See id.* at 18–19, 22, 25–28; *cf.* 48 C.F.R. § 44.101 (2013) ("'Subcontractor' means any supplier, distributor, vendor, or firm that furnishes supplies or services to or for a prime contractor or another subcontractor"). It later seems to limit this assertion in a footnote, however, landing (apparently) on the position that a "person indemnified" must at least be a vendor or supplier who is "involved" in performing a contract subject to the PAA. *See id.* at 22 n. 9 ("Certainly, it is not our brief here that an entity must literally have a contract with the United States to be entitled to PAA indemnification").

Whatever their specific position, the first problem with this line of argument is that it seeks to impose conditions not present in the PAA itself. Construed in the broader context of the original Act, the introductory sentence in Section 170(d) merely specified the types of contracts in

which the United States could execute an indemnity agreement. *See* Ex. 2, § 170(d) at CO 038. At most, this sentence suggests that the existence of such an agreement was a condition to triggering the United States' indemnity obligations under the original Act. That condition is met here by the PAA indemnity agreement between the United States and Mallinckrodt. Compl. ¶¶ 25–35; Gov. Br., Ex. A at 742–50.

But nothing in Section 170(d) purported to limit the Government's indemnity obligations to persons who have certain contracts or relationships or who perform certain contractual activities. If that were true, the phrase "shall indemnify the persons indemnified," used later in Section 170(d), would make no sense because (1) "person indemnified" has always included "***any*** other person who may be liable for public liability," Ex. 2, § 11(r) at CO 037 (emphasis added), and (2) "person" has always covered "***any*** . . . corporation . . . or other entity," Ex. 3, § 2014(q) at CO 045 (emphasis added). *See also Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) (warning against statutory interpretations that "render[] superfluous another portion of that same law"); *New York and Presbyterian Hosp. v. United States*, 881 F.3d 877, 885 (Fed. Cir. 2018) ("The preeminent canon of statutory construction requires us to presume that the legislature says in a statute what it means and means in a statute what it says there.") (internal citations omitted).

Had Congress wanted to limit PAA indemnity as the Government suggests, it could have used the phrase 'shall indemnify *any person who performs activities in support of the prime contract*' in Section 170(d); or it might have defined "person indemnified" in Section 11(r) as 'any *person who may be liable for public liability due to their activities under an AEC contract*.' Congress also could have said 'person means any . . . corporation . . . or other entity, *except that in Section 170(d) it means only those who perform contract activities benefiting the government*.'

And it had the option to define "public liability" in way that excluded the liability of persons who are not 'involved' in performing a contract subject to the PAA.[7] However, neither Section 170(d) nor Section 11, nor any other part of the original Act, used such language.

To be sure, a plaintiff must allege "public liability arising out of or in connection with the contractual activity." Ex. 2, § 170(d) at CO 038. Cotter's Complaint does that here. *Supra* Section I.A. But, under the plain terms of the statute, Cotter does not need to show that it had a contract or relationship with the AEC or Mallinckrodt ***or*** that it was sued for public liability because of contractual activities it performed under the AEC-Mallinckrodt Contract. The Government gets this wrong throughout its brief, asserting in various ways that "Cotter's ***activities*** using the radioactive material that resulted in public liability did not arise out of or connection with the contractual activity." *See, e.g.*, Gov. Br. at 22 (emphasis added); *see also id.* at 22 n. 9, 26–28.

This is an obvious straw man, first, because it misstates the controlling standard in Section 170(d), which conditions PAA indemnity on "***liability*** arising out of or in connection with the contractual activity," Ex. 2, § 170(d) at CO 038 (emphasis added), not ***activities*** that arise out of or connection with the contractual activity; and, second, because the correct standard is far more flexible, embracing a range of ***liability*** that stems from nuclear incidents involving radioactive material generated for the United States. *See id.*; *see supra* n. 5–6 (describing the broad meaning of the terms "arising out of" and "in connection to") and *infra* Section I.B.2. In contrast, the Government's formulation, in a roundabout twist, simply leads back to the false premise that PAA indemnity is available only to persons who have certain contracts or relationships or who perform

---

7 In 1957, the only exceptions in the PAA's definition of "public liability" were for certain workers' compensation claims and claims arising out of an act of war. Ex. 2, § 11(u) at CO 037.

certain contract activities. *See, e.g.*, Gov. Br. at 26 ("Cotter's [waste] disposal . . . was not an ***activity*** that 'arises out of or in connection with the contractual activity' of Mallinckrodt as it processed uranium, ***because*** Cotter's disposal did not further the performance of the Mallinckrodt Contract.") (emphasis added).

Most important, the Act itself disproves the notion that PAA indemnity is limited in the way the Government claims. In the 1962 PAA amendments, Congress updated the definition of "person indemnified" to specify that, for nuclear incidents ***outside the United States***, the Act would cover only the indemnified contractor and "any other person who may be liable for public liability ***by reason of his activities under any contract with the Commission*** . . . ***or under any subcontract, purchase order or other agreement, of any tier, under any such contract.***" Ex. 4, § 11(r) at CO 086 (emphasis added). This is precisely the type of 'contracts, relationships, activities' condition that the Government says had been present in the PAA all along. *See* Gov. Br. at 7 n. 3, 17, 18–22, 25–28. But the problem for the Government is that the 1962 amendments did not impose such a limitation for nuclear incidents inside the United States like those in *McClurg*. Instead, for domestic nuclear incidents, Congress preserved the original definition of "person indemnified," which since 1957 has included "***any*** other person who may be liable for public liability." Ex. 3, § 2014(r) at CO 045; 42 U.S.C. § 2014(t) (2005) (emphasis added).

In drawing this distinction, the 1962 amendments furthered the Act's "primary purpose" because, while the United States Government is tasked to "protect the public" here at home, that responsibility falls to other governments when a nuclear incident occurs abroad. Ex. 5 at CO 095. The amendments also show that Congress knew exactly how to limit PAA indemnity to persons who are sued for public liability because of their contractual status, relationships, and activities. Congress chose not to apply such conditions to persons who face public liability for a

nuclear incident within the United States. And that leads to only one possible conclusion here—to enjoy PAA indemnity, Cotter was not required to have certain contracts or relationships, and it was not required to perform contractual activities for the United States' benefit. The Government makes no persuasive argument to the contrary and, thus, the Court must presume that the Act "says what it means and means what it says." *See Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016).

2. The PAA's Legislative History Confirms That PAA Indemnity Is Not Limited To Persons Who Perform Activities In Support Of A PAA-Covered Contract

The Act's legislative history confirms what is clear from the statutory text—when a nuclear incident occurs in the United States, as in *McClurg*, PAA indemnity is not limited to persons who have contracts or relationships to perform contractual activities for the Government's benefit. For example, in a 1957 Congressional report, the Joint Committee on Atomic Energy stated that:

> Where the Commission and a contractor decide to take advantage of the provisions of this act, an indemnity agreement will be executed with the prime contractor. ***The phrase "person indemnified" also covers any other persons who may be liable*** . . . [T]his would mean in addition to the [prime contractor] that the indemnification extends to such persons as the subcontractors . . . responsible for the design and construction of the reactor and the supplying of parts. ***However, it is not meant to be limited solely to those who may be found liable due to their contractual relationship with the [prime contractor]***.
>
> In the hearings, the question of protecting the public was raised where some unusual incident, ***such as negligence in maintaining an airplane motor, should cause an airplane to crash into a reactor and thereby cause damage to the public.*** Under this bill, ***the public is protected and the airplane company can also take advantage of the indemnification*** . . . The ***proposed AEC limitation to those in privity with the [prime contractor] was reconsidered by the Commission***, and the Commission decided to accept the premise of the original bills which would ***make the person indemnified any person who might be found liable, regardless of the contractual relation***.

Ex. 1 at CO 017. Two important points emerge from this explanation.

First, both Congress and the AEC specifically considered—and rejected—a rule that would have required a contractual relationship between the indemnified prime contractor (Mallinckrodt) and other persons indemnified (Cotter). The Government cannot upend that settled judgment here.

Second, the 1957 report reflects Congress's decision to create a flexible standard for showing that a person's public liability "aris[es] out of or in connection" with the underlying contractual activity. Ex. 2, § 170(d) at CO 038. In the example of the negligent airplane company, Congress could have taken the position that the Government takes here and required proof of a contract, relationship, or activities that benefited the United States under a PAA-covered contract. It also could have said that the airline's maintenance activities would 'arise out of or in connection with the contractual activity' only if those activities were performed ***for*** such a contract. But, unlike the Government now, Congress did not even hint at imposing such conditions, and surely if an airline is entitled to indemnity in such "unusual" circumstances, then Cotter's Complaint states a claim for statutory indemnity here. Ex. 1 at CO 017.[8]

Congress has reiterated the views it expressed in the 1957 report when amending the PAA over the years. *See, e.g.*, Ex. 5 at CO 095 ("Price-Anderson indemnity coverage has, from its inception extended to ***any person*** who may be liable for public liability. This coverage was intentionally broad since the primary purpose of the legislation was to protect the public . . .) (emphasis added); Ex. 7, 94 Cong. Rec. S14579, S14592 (daily ed. Aug. 8, 1974), at CO 131

---

8 Despite this legislative history, the Government claims it makes sense to limit the indemnity to persons who perform contract activities because Congress enacted the PAA to "incentivize industry" participation in domestic nuclear development. Gov. Br. at 19, 23. But, while Congress did want to attract companies to the nuclear industry in 1957, that was not the PAA's "primary purpose." *See* Ex. 5 at CO 095. The Act's main purpose was (and still is) to protect the public by ensuring public funds are available to cover damages caused by a domestic nuclear incident. That goal would be undermined if compensation is guaranteed only when certain persons cause a nuclear incident while performing certain activities.

("[Indemnification] [c]overage . . . also ***applies to strangers*** . . . and would apply in the case of every nuclear incident and would protect ***each and every person*** who might have liability ***regardless of that person's relationship*** with [an indemnified prime contractor]") (emphasis added); Ex. 8, S. Rep. No. 100-218, (1988), *as reprinted in* 1988 U.S.C.C.A.N. 1476, 1477, at CO 150 ("[T]he 1957 Act provided that ***any person*** who might be liable for public liability resulting from a nuclear incident, including ***not only the party directly engaged in the activity that results in the nuclear incident but any other person as well***, was to be to indemnified under the Price-Anderson system—the so-called 'channeling of liability' or 'omnibus coverage' provisions of the Act") (emphasis added).

The Government ignores this legislative history, yet goes out of its way to suggest that DOE has adopted a different view of its statutory obligations, citing a 1999 DOE report. Gov. Br. at 24–25. In reality, this report undermines the Government's position even more because it confirms what is clear from the plain language and legislative history of the Act itself. The DOE report states that PAA indemnity is available to "***any person*** that may be legally liable for a nuclear incident, ***regardless*** of whether they have ***any contractual or other relationship*** with DOE." *Id.*, Ex. K at 12 (emphasis added). This contradicts numerous statements in the Government's brief, including its characterization of the report itself. *Compare id.*, *with* Gov. Br. at 18 (asserting that Cotter's right to indemnity must arise "from a ***contractual relationship*** with the United States") (emphasis added) and *id.* at 25 ("DOE stated that Government indemnification requires that there be a ***contractual relationship*** with the Government . . .") (emphasis added).[9]

---

9 According to the Government, DOE supposedly "cabined" this statement by observing that "DOE indemnification 'covers any arrangement that is contractual in nature and that DOE uses to secure a direct benefit for its account in furtherance of its mission.'" *Id.* at 24. Placed in context, this sentence merely explained that DOE has authority to incorporate PAA indemnity agreements in both procurement and non-procurement contracts (e.g., grants and cooperative agreements).

Seeking to stretch the DOE report yet further, the Government highlights the following language: "The DOE indemnification does not cover commercial activities that are not for the account of DOE . . ." *Id.* at 24–25. But the Government does not address the next three sentences, which explain that such "commercial activities":

> [M]ay take place in ***proximity*** to nuclear material that is a ***legacy from prior contractual activity*** conducted for DOE. ***If a nuclear incident results from such legacy material, then the commercial activity would be included within the omnibus coverage of the DOE indemnification that related to the contractual activity that resulted in the legacy material.*** In cases of commercial activity in proximity to legacy material, DOE believes there would be a ***general presumption*** that any nuclear incident resulted from the legacy material.

*See id.*, Ex. K at 19 (emphasis added). These statements are consistent with the PAA's flexible standard for showing that a person's "public ***liability*** aris[es] out of or in connection with the contractual activity." Ex. 2, § 170(d) at CO 038 (emphasis added). They also show why the facts in Cotter's Complaint are sufficient to meet that standard. Unlike the commercial entities in DOE's example, Cotter was not simply "in proximity" to legacy nuclear material produced for the United States. Cotter actually possessed and handled such legacy nuclear material and, as a result, it was sued in the same public liability action as Mallinckrodt—the company that generated the material for the United States. Compl. ¶¶ 12–24, 36–43. If a commercial company is entitled to indemnity just for ***being close*** to a nuclear incident involving legacy radioactive material, then it is certainly reasonable to infer that Cotter is entitled to the same relief here.

Finally, upsetting the balance between public liability and broad PAA indemnity would have negative consequences extending far beyond this case. The United States is a party to the Convention on Supplementary Compensation for Nuclear Damage (the "CSC"), an international treaty that provides consistent rules for apportioning legal liability when a nuclear incident occurs in a CSC party's territory. Preserving the broad class of persons indemnified under the PAA is a

key condition of the United States' participation in the CSC. *Compare* 42 U.S.C. § 2014(t), *with* Ex. 9, CSC, Annex art. 2.1.b, July 22, 1998 INFCIRC/567, at CO 198 (stating that a CSC participant's national law must "require the indemnification of ***any*** person" who has legal liability for damage resulting from a nuclear incident) (emphasis added). Thus, adopting the Government's narrower interpretation would not only threaten to disturb the allocation of treaty authority under the Constitution, it would risk placing the United States in default of its international obligations. Simply put, the Court need not take on those risks here.

### C. Cotter Is Eligible For Statutory Indemnity Under PAA Section 170(d), Even Though It Was Not Issued An Indemnification Agreement Under PAA Section 170(a)

The Government argues next that Cotter is ineligible for PAA indemnification because, as an AEC licensee, Cotter was not required to maintain financial protection and thus was not issued an indemnity agreement under Section 170(a) of the PAA. Gov. Br. at 28–29. But that does not mean Cotter is ineligible for PAA indemnification here. It just means Cotter is eligible for PAA indemnification ***under Section 170(d)***, not Section 170(a).

As shown above, Cotter's Complaint contains enough facts to plead each element of a statutory indemnity claim under PAA Section 170(d). *Supra* Section I.A. Cotter also shows that indemnification under Section 170(d) is not limited to persons who have certain contracts or relationships or who face public liability because of their activities under a contract benefiting the United States. *Supra* Section I.B. This alone defeats the Government's motion to dismiss Count I, and the Court need not reach the Government's argument as to Section 170(a). If there is anything to say about that argument, however, it is that the absence of an indemnity agreement under Section 170(a) has no bearing on Cotter's eligibility for indemnification under Section 170(d).

Since 1957, the PAA has precluded Section 170(d) indemnity for "public liability arising out or in connection with [a] licensed activity" ***if*** the activity is subject to the financial protection

requirements for licensees ***and*** the liability is covered by an indemnification agreement issued under Section 170(a). *See* Ex. 2, §§ 170(a) and (c) at CO 037–38; 42 U.S.C. § 2210(d)(1)(A) (2006). This limitation on Section 170(d) indemnity also appears in the PAA indemnity agreement between Mallinckrodt and the United States. Gov. Br., Ex. A at 745.

The Government misreads this to mean that PAA indemnity is not available to a licensee ***at all*** if both the conditions for Section 170(a) indemnity are not met. *See id.* But the Government has it backwards. The Act's plain language makes clear that, if a licensee meets all the conditions of Section 170(d), and its public liability is not otherwise covered by a Section 170(a) indemnity agreement (e.g., because financial protection was not required), then the licensee is still entitled to indemnification under Section 170(d). Nothing in the PAA says or suggests otherwise. And, until now, the United States has agreed with this harmonization of Sections 170(d) and 170(a):

> DOE is not authorized to indemnify activities undertaken pursuant to a[n] NRC license that extends NRC Price-Anderson Act coverage to such activities. Thus, ***if*** a nuclear incident resulted from an activity undertaken pursuant to a[n] NRC license ***and*** the NRC license provided for Price-Anderson coverage, the NRC license would govern legal liability resulting from the incident, including the limit on the aggregate amount of liability and the source of funds to compensate the liability. ***If, however, the NRC decided not to provide for Price-Anderson Act coverage in the license, the DOE Price-Anderson indemnification would apply to the incident.***

Ex. 10, DOE Off. of Gen. Couns., Preparation of Report to Congress on Price-Anderson Act, 62 Fed. Reg. 68,272, 68,274 at CO 211 (Dec. 31, 1997) (emphasis added).

The Government's interpretation in this case not only clashes with the Act's plain text and the United States' prior views, it would thwart the law's "primary purpose" of making federal funds available to cover public liability regardless of the identity or activities of the person who causes a domestic nuclear incident. *See* Ex. 5 at CO 095. Indeed, the PAA's "omnibus coverage" would hardly be complete if the Act did not respond when a person independently satisfies all the

requirements of Section 170(d). Ex. 8 at CO 150. But the Act does respond in these situations, as shown above, and thus the Government's argument fails.

### D. The Sale And Licensing Documents The Government Cites Are Irrelevant To Cotter's Claims For Statutory And Contractual Indemnity Under the PAA

The Government also contends that Cotter is ineligible for indemnification under PAA Section 170(d), and as a third-party beneficiary of the PAA indemnity agreement, because certain documents relating to the downstream sale and use of the radioactive source material did not expressly say that the United States would indemnify persons like Cotter. Gov. Br. at 30–32. This is another obvious misdirection.

First, to the extent the AEC meant to say ***anything*** about PAA indemnity in the 1966 Bill of Sale, its intentions are irrelevant to Cotter's count for ***statutory*** indemnification (Count I). The same is true of any designs that may have informed the sales agreement between Commercial Discount and Cotter. The only "intent" relevant to Count I is that of Congress. And, as already discussed at length, Congress clearly wanted the legal protections in Section 170(d) to extend beyond persons engaged in contract activities, and it has reaffirmed that plan in the Act for more than 65 years.

Congress's intent is on display throughout the statute, including in the broad terms it has used since 1957 to define "public liability," "nuclear incident," "person," and "person indemnified." *Compare* Ex. 2, § 11(o)(r)(u) at CO 037 and Ex. 3, § 2014(q) at CO 045, *with* 42 U.S.C. § 2014 (2005). Those intentions also are evident in the flexible "arising out of or in connection" standard Congress used in Section 170(d), which captures the liability of even purely commercial entities when a domestic nuclear incident involves radioactive material generated for the United States. *See* Ex. 1 at CO 017; *see also* Gov. Br., Ex. K at 19. Though the Government

may now claim in litigation to have "understood" things differently when it executed the Bill of Sale, Gov. Br. at 30, that purported understanding is not germane to Count I.

Second, there can be no dispute that the AEC and Mallinckrodt were required to implement the core terms and purposes of the PAA when they executed the indemnity agreement for the Contract in 1962. *Supra* Section II. So as to Cotter's third-party beneficiary count (Count II), the only question about the Government's "intent" is whether the AEC and Mallinckrodt intended to faithfully execute ***Congress's will*** as expressed in the Act itself. And that is exactly what the AEC and Mallinckrodt did in the PAA indemnity agreement, adopting the Act's defined terms and closely mirroring the language used in a model indemnification form prepared by Congress. *See* Gov. Br., Ex. J at 93; *id.* Ex. A at 742–50. That PAA indemnity agreement is still in effect today, and it continues to reflect Congress's decision to benefit persons like Cotter. Compl. ¶¶ 33–34; Gov. Br., Ex. A at 742–50.

Despite this, the Government insists that certain sale documents, executed years after the relevant indemnity agreement, show that it never intended to indemnify persons like Cotter. But this ignores that the generic disclaimers in those documents were not incorporated into the AEC-Mallinckrodt Contract and thus have no bearing on the unambiguous statutory terms that the AEC and Mallinckrodt adopted in the PAA indemnity agreement. *See Premier Office Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011–12 (Fed. Cir. 2019) ("If a contract provision is clear and unambiguous, the court may not resort to extrinsic evidence to interpret it . . . [the] inquiry ends and the plain language of the [a]greement controls.") (internal citations omitted).

Further, if the Government later wanted to 'disavow' its indemnity obligations when it sold off the radioactive material, it could have approached Mallinckrodt about making a bilateral amendment to the PAA indemnity agreement. *See* Gov. Br., Ex. A, ¶ 7 at 745 (allowing the parties

to amend the PAA indemnity agreement by "mutual written agreement"). But there is no evidence the Government ever sought to amend the agreement. And even if it had done so, the Government and Mallinckrodt could not make changes that are inconsistent with terms and purposes of the PAA—e.g., by purporting to cut other "persons indemnified" out of the indemnity agreement based upon their contractual status, relationships, or activities. *See supra* Section I.B.

Finally, to the extent the Government complains that the sale documents and Cotter's license contain no affirmative signs of the United States' indemnity obligations, that too is irrelevant. Gov. Br. 31–33. At most, the original Act required the existence of some indemnity agreement covering other "persons indemnified" under Section 170(d). Ex. 2, § 170(d) at CO 038. Such an agreement exists here between the United States and Mallinckrodt, Gov. Br., Ex. A at 742–50, and Cotter is covered by both the Act itself and as an intended third-party beneficiary of that indemnity agreement (as shown below). The Government does not and cannot cite any authority requiring more specific evidence of Cotter's right to statutory or contractual indemnity.

## II. **Cotter's Complaint States A Claim For Indemnification As An Intended Third-Party Beneficiary Of The PAA Indemnity Agreement (Count II)**

As with Count I, Cotter's Complaint contains enough factual detail to state a claim for indemnification as an intended third-party beneficiary of the PAA indemnity agreement between the United States and Mallinckrodt. The Government says Count II should be dismissed because, in its view, it is not realistic to conclude that the AEC and Mallinckrodt had Cotter in mind when they entered into that agreement. In the process, however, the Government misstates the applicable legal standard and again ignores that, in this case, Congress's intent is controlling. Thus, the Government's motion to dismiss Count II also must be denied.

### A. The Facts In The Complaint Are Sufficient To State A Third-Party Beneficiary Claim

"The test for third-party beneficiary status is whether the contract reflects the intent of the contracting parties to benefit a third party. The intended benefit ***must be direct***. The third party need not be specifically identified but ***must be in a class clearly intended to be benefited***. For determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1345 (Fed. Cir. 2021) (internal citations omitted) (emphasis added).

Here, the Complaint alleges facts sufficient to show that Cotter belongs to a class of "other persons indemnified" clearly intended to benefit directly from the PAA indemnity agreement. Compl. ¶¶ 25–35, 61–70. As discussed above, that indemnity agreement cites and incorporates the PAA, including the Act's definitions and the flexible public liability standard used in Section 170(d). *Id.* ¶¶ 25–29. And consistent with the Act and Congress's model indemnification form, the agreement specifies that PAA indemnity extends to public liability arising from, *inter alia*, "a nuclear incident which involves . . . material . . . produced or delivered" by Mallinckrodt under the Contract. *Id.* ¶ 29; Gov. Br., Ex. J at 94. Because the AEC and Mallinckrodt wrote the indemnity agreement to implement the Act without deviation, the agreement itself is clearly intended to benefit a class of persons who are eligible for PAA indemnity under Section 170(d). *See, e.g., Columbus Reg'l Hosp.*, 990 F.3d at 1345–46 (denying motion to dismiss third-party beneficiary claim where plaintiff was part of a class of persons intended by statute to benefit directly from a government agreement).

Cotter is included in that class of persons. As stated in the Complaint, *McClurg* involved claims for "public liability" arising out of a "nuclear incident," and Cotter is both a "person" and

"person indemnified," as those terms are defined and used in the Act and thus the indemnity agreement. Compl. ¶¶ 10, 22–43, 55–58; Ex. 2, § 11 at CO 037; Ex. 3, § 2014(q) at CO 045. Cotter's alleged liability stemmed from its possession and handling of the same legacy radioactive material that Mallinckrodt generated for the AEC. Compl. ¶¶ 4–6, 12–15, 22–24, 36, 42–43. So that liability not only "arises out of or in connection" with Mallinckrodt's contractual activity, it "arises out of or results from" a nuclear incident involving "material" that Mallinckrodt produced and delivered under the Contract. *Id.* ¶ 29; *supra* Section I.A (explaining the ordinary meaning of "arising out of," "arises out of," "in connection with"). And the intended benefit under the indemnity agreement is direct because any person who meets the foregoing requirements is entitled to a defense or compensation from the Government in lawsuits alleging public liability, such as *McClurg*. Compl. ¶¶ 31–32, 71–74.

The Government makes three related arguments in response, but none are persuasive. To start, the Government claims it is implausible that the AEC and Mallinckrodt "were even thinking about Cotter" when they executed the indemnity agreement. Gov. Br. at 33. That, of course, is not the test for third-party beneficiary status, which is met if a person is in "a class clearly intended to be benefited" directly under a contractual agreement. *State of Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997). Cotter alleges facts that credibly satisfy the correct standard, as shown above.

The Government also questions why the AEC and Mallinckrodt "would have, between them, gratuitously agreed to indemnify" an entity like Cotter. Gov. Br. at 35. But this again misses the point. Because the AEC and Mallinckrodt fully adopted the terms of the PAA in the indemnity agreement, the relevant question is whether ***Congress***, in creating those terms, intended for commercial entities to be indemnified when a domestic nuclear incident involves radioactive

material produced for the Government. Congress has clearly expressed that very intention since 1957 to further its primary goal of protecting the public, and the Government cannot show otherwise. *See* Ex. 2, §§ 11, 170(d) at CO 037–38; Ex. 1 at CO 017; Ex. 7 at CO 131; Gov. Br., Ex. K at 19.

Finally, the Government argues that the AEC and Mallinckrodt could not have intended to benefit Cotter because Congress made PAA indemnity available only to entities who have certain contracts or relationships or perform contractual activities for the United States' benefit. *See* Gov. Br. at 33–36. This is just a different flavor of the Government's flawed position on Count I. Congress did not condition the right to PAA indemnity on a person's contracts, relationships, or activities when a nuclear incident occurs in the United States and, therefore, neither did the AEC and Mallinckrodt. *Supra* Section I.B. In fact, the AEC and Mallinckrodt did the opposite when they incorporated the 1962 PAA amendments in the indemnity agreement. *See* Gov. Br., Ex. A at 748–50. Those amendments expressly limited PAA indemnity to certain persons who are sued for public liability due to their contract activities—but ***only*** as to nuclear incidents abroad, ***not*** for domestic nuclear incidents like those in *McClurg*. *See* Ex. 4, § 11(r) at CO 086; Ex. 5 at CO 095.

### B. The Facts In The Complaint Are Sufficient To Support The Conclusion That The Government Breached The PAA Indemnity Agreement In *McClurg*

For its next argument, the Government says the Complaint fails to state a claim under Count II because it does not allege that Cotter "previously presented" an indemnity claim to the United States or that the "Government rejected" such a claim. Gov. Br. at 36–37. This argument fails, first, because Cotter had no duty to present an indemnity claim to the Government and, second, because the facts alleged in the Complaint clearly support the conclusion that the United States breached the indemnity agreement. *See San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 470 (2019) (quoting *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir.

2014)) ("[A] breach of contract claim requires . . . factual allegations sufficient to support the conclusion that there has been a breach of [a] contractual duty.").

The Government ignores the claim procedures in the PAA indemnity agreement. Compl. ¶¶ 30–32. Those provisions do not require Cotter, as an "other person[] indemnified," to present a claim for PAA indemnification to the United States. *See id.* At most, they require Mallinckrodt to present such a claim. *See* Gov. Br., Ex. A, ¶ 4(b) at 745. Cotter has alleged that the United States was formally notified of the *McClurg* action in March 2012. *See* Comp. ¶ 38. But even if it was not, the Government must still indemnify all persons covered under the agreement. *See id.* ¶ 33 ("The obligations of the Commission under this article shall not be affected by any failure on the part of the Contractor to fulfill any of its obligations under this contract . . ."). Indeed, when a public liability action might implicate the Government's indemnity obligations, the United States has an independent duty to determine if it will assume the defense or settlement of the case ***or*** collaborate with and then compensate the persons indemnified who are named as defendants. *See id.* ¶¶ 31–32; Ex. 2, § 170(h) at CO 039; 42 U.S.C. § 2210(h)(2006).

The Government does not deny that the United States was notified or otherwise became aware of the *McClurg* lawsuit in early 2012. *See* Gov. Br. at 15 (asserting only that Cotter did not notify the United States). Either way, there is no disagreement that the United States was on notice of *McClurg* at least as of February 22, 2018. *Id.* That is the date the district court ordered the United States to participate in settlement discussions due to its role as "a possible indemnitor." *See* Compl. ¶ 46; *see also* Ex. 11, Mem. and Order, *McClurg*, No. 4:12-cv-00361-AGF (E.D. Mo. Feb. 22, 2018), ECF No. 690 at CO 221. A few weeks later, the United States sent a letter to the district court declining to participate in the *McClurg* settlement discussions. *Id.* ¶ 47.

This letter made two points clear. First, the United States took the same flawed position it basically takes here—that its indemnity obligations in *McClurg*, if any, were limited to "DOE contractor[s]" because such obligations could only "be as a result of a contractual relationship with a party to this litigation." *See* Ex. 12, Letter to J. Audrey Fleissig, *McClurg*, No. 4:12-cv-00361-AGF (E.D. Mo. Mar. 7, 2018), ECF No. 692 at CO 223–24.[10] Second, the Government stated that its "usual practice is to decline to participate in discussions between private parties and a DOE contractor regarding the possible settlement of tort claims, even though such a settlement ultimately may result in some obligation on DOE to indemnify its contractor." *Id.* at CO 223.

Thus, in *McClurg*, the United States did not innocently overlook its legal obligations to "other persons indemnified" like Cotter; it openly denied that the Government had any obligations at all to any person other than (potentially) Mallinckrodt, even though the indemnity agreement expressly says otherwise. *Compare* Compl. ¶¶ 28, 31–32, 47, *with* Ex. 12 at CO 223–24. And, when ordered by a federal judge to participate in the settlement or defense of *McClurg*, the United States declined, not because it decided it would "probably [not] be required to make indemnity payments," but because that is supposedly its "usual practice." *Compare* Comp. ¶¶ 31–32, 47 and Gov. Br, Ex. A, ¶ 4.a at 744, *with* Ex. 12 at CO 223.

---

10 DOE Deputy General Counsel, Mr. Eric J. Fygi, signed the letter to Judge Fleissig in which DOE asserted that its indemnity obligations in *McClurg* were limited to "DOE contractors" with whom DOE has a "contractual relationship." Ex. 12 at CO 224. Years earlier, however, Mr. Fygi also signed a Federal Register notice on behalf of DOE, stating that the term "person indemnified . . . extends the protection of the DOE Price-Anderson indemnification to ***any person***, including those persons who have ***no legal relationship to DOE or the indemnified contractor*** . . ." Ex. 10 at CO 211 (emphasis added). It is unclear how the same Government agency, and even the same civil servant, could reach such polar opposite conclusions on the very same question, particularly since the relevant terms of the Act have not changed in more than six decades.

Accepted as true, these facts clearly support the reasonable inference that the United States breached its contractual indemnity obligations to Cotter in *McClurg*, and thus the Government's RCFC 12(b)(6) motion to dismiss Count II should be denied. *See, e.g.*, *San Antonio Hous. Auth.*, 143 Fed. Cl. at 470; *Dobyns v. United States*, 91 Fed. Cl. 412, 422–30 (2010) (holding that, under RCFC 8, a complaint for breach of contract must only include "enough factual detail to put defendant on notice as to the basic nature of the claims raised").

### C. Cotter Has Standing To Pursue Count II Because It Is An Intended Third-Party Beneficiary Of The PAA Indemnity Agreement

Last, the Government argues that Count II should be dismissed for lack of standing because it says Cotter has not stated a plausible claim for indemnification as an intended third-party beneficiary of the PAA indemnity agreement. As shown above, however, Cotter does state a valid third-party beneficiary claim. Thus, Cotter has standing to pursue Count II, and the Government's RCFC 12(b)(1) motion to dismiss should also be denied. *G4S Tech. LLC*, 114 Fed. Cl. at 669.

## CONCLUSION

For the reasons stated above, the Court should deny the Government's Motion to Dismiss Cotter's Complaint under RCFC 12(b)(6) and RCFC 12(b)(1).

Dated: September 22, 2022

Respectfully submitted,

**MILLER & CHEVALIER CHARTERED**

*<u>/s/ Alejandro L. Sarria</u>*

Alejandro L. Sarria
MILLER & CHEVALIER CHARTERED
Black Lives Matter Plaza
900 16th Street NW
Washington, DC 20006
202.626.5822 (Direct)
202.626.5801 (Facsimile)
asarria@milchev.com (Email)
*Lead Attorney for Plaintiff Cotter Corp. (N.S.L.)*

*Of counsel*

Jason N. Workmaster
Connor W. Farrell
Alexandra S. Prime
MILLER & CHEVALIER CHARTERED
Black Lives Matter Plaza
900 16th Street NW
Washington, DC 20006
202.626.5800 (Main)
202.626.5801 (Facsimile)

**CERTIFICATE OF SERVICE**

I certify that I electronically filed this **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** with the Clerk of the United States Court of Federal Claims on this 22nd day of September 2022 using the CM/ECF System.

*/s/ Alejandro L. Sarria*
Alejandro L. Sarria
MILLER & CHEVALIER CHARTERED
Black Lives Matter Plaza
900 16th Street NW
Washington, D.C. 20006
(202) 626-5800 (Direct)
(202) 626-5801 (Facsimile)
asarria@milchev.com (Email)
*Lead Attorney for Plaintiff Cotter Corp. (N.S.L.)*